ANNEMARIE HATCH *et al.*, Plaintiffs-Appellants, v. GOLDEN RULE IN-
SURANCE COMPANY, Defendant-Appellee.

Second District   No. 2—89—1121

Opinion filed October 19, 1990.—Rehearing denied December 3, 1990.

Paul G. Brinkman, of Wheaton, for appellants.

Edward W. Moltzen, Sheldon A. Brenner, and Lisa M. Carrizales, all of Bresler, Brenner, Moltzen & Harvick, of Chicago, and Guy E. McGaughey, of McGaughey & McGaughey, of Lawrenceville, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiffs, Annemarie Hatch (Annemarie) and Master Partners, Inc., filed a three-count complaint against the defendant, Golden Rule Insurance Company, alleging breach of an insurance contract and seeking injunctive relief and damages. Subsequently, an amended complaint was filed. Defendant filed a counterclaim for declaratory judgment. Prior to trial, count I of the amended complaint, which sought injunctive relief, was dismissed. Following a bench trial, judgment was entered in favor of the defendant, and plaintiffs appeal.

On appeal, the plaintiffs raise the following issues: whether the decision of the trial court was against the manifest weight of the evidence; and whether the trial court erred in failing to bar the testimony of defendant's expert because he had not been disclosed to be an expert witness pursuant to Supreme Court Rule 220 (107 Ill. 2d R. 220).

Annemarie began working for Master Partners, Inc., in October 1986. As part of her employment benefits, she was to be provided with health insurance coverage. On October 25, 1986, Larry Tabor, an insurance broker employed by the Splinter Agency, came to Annemarie's office to take her application for health insurance with the defendant, one of the companies that Splinter Agency represented. Tabor asked her the questions on the application and then wrote down her answers. Tabor then gave her the application to review and to sign. According to Annemarie, she signed the application but did not really read it. She also gave Tabor a check for the insurance premium.

In January 1987, Annemarie was hospitalized and diagnosed as suffering from bipolar depression due to medication she was receiving. Following her release from the hospital, she submitted her bills to the defendant. Defendant requested Annemarie's consent to obtain her medical records. On June 3, 1987, she received a letter from Thomas LeGrand, a claims adjuster for the defendant. In denying her claim for insurance, LeGrand's letter stated in pertinent part as follows:

"During the course of investigating your claim, medical records were requested and received from Dr. Chowatterkunnel [*sic*]. These medical records indicate significant medical history which was not reported on your application for insurance coverage. The records reviewed indicate that you had an episode of vertigo and your heart was skipping beats on October 3, 1986. At that time Dr. Chowattukunnel prescribed Ativan. ***

If the information had been shown correctly on your application, our underwriter would have been unable to issue your policy.

Now that this information is known, it is necessary to take the same action as we would have taken if the full facts had been given to us at the time you applied for insurance.

Your policy has been voided. ***

The claim submitted for yourself is currently being denied because your policy has been voided due to the misstatement on your application."

Defendant's counterclaim alleged that Annemarie had made material misrepresentations when answering questions 14 and 17 on her application for insurance, both of which related to her visit to Dr. Chowattukunnel on October 3, 1986. Those specific questions are as follows:

"14. Has any person named in No. 1 (person to be covered by insurance) within the last 10 years, had any indication, diagnosis, or treatment of:
***

b) Any disorder of the heart or circulatory system, including high blood pressure, anemia or other blood disorder, heart attack, heart murmur, chest pain, irregular heartbeat, varicose veins or phlebitis?
***

17. Has any person named on this application seen a doctor in the last 5 years? If yes, give the details and the names and addresses of all doctors seen. Give details in 18 below. Include dates and reasons seen and results."

Annemarie answered "no" to both questions.

At trial, Annemarie testified that on October 3, 1986, she had an office appointment with her family doctor, Dr. Chowattukunnel. She told the doctor that her heart seemed to be skipping beats, and she was dizzy on occasion. Dr. Chowattukunnel had an EKG performed on Annemarie, the results of which were normal. Dr. Chowattukunnel did prescribe Ativan for her, but she denied that it had anything to do

with her heart. She remembered telling Larry Tabor that Dr. Chowattukunnel was her family physician because, due to the difficulty of spelling the doctor's name, she wrote it out for him. Although she testified that she believed that she had given a full statement of her medical condition and was completely truthful when she filled out the application, she admitted that she did not tell Larry Tabor about the complaints she reported to Dr. Chowattukunnel.

Larry Tabor testified that the "no" answer to question 17 appears to conflict with the answer to question 18 which indicated that Annemarie's son had received medical treatment within the past five years. He explained that he would check "no" to 17 where the medical treatment was explained in prior questions. In the instant case, he determined that 17 should be marked "no" after reviewing the other questions.

Thomas LeGrand testified that based upon the October 3, 1986, record of Annemarie's visit to Dr. Chowattukunnel, which included the notation as to her heartbeat skipping, vertigo, and prescription for Ativan, a question as to whether her claim should be paid arose.

Dr. Chowattukunnel testified that he saw Annemarie on October 3, 1986, in his office. According to the doctor, his nurse writes down a patient's complaints, and then he conducts a further interview. His nurse had noted that Annemarie complained of heartbeat skipping and dizziness. He examined her and ordered an EKG. His physical examination did not reveal any cardiac irregularity, and the EKG did not reveal any abnormality. Her pulse rate was slightly above normal limits, but her blood pressure was normal. The doctor felt that Annemarie was suffering from possible anxiety, although he did not write that diagnosis down, but he did prescribe Ativan, an anti-anxiety medicine. Ativan is not the treatment for vertigo. According to the doctor, Annemarie's heart was normal, and there was nothing in her previous history that would indicate she ever had any heart problems.

On cross-examination, Dr. Chowattukunnel testified that Annemarie's symptoms were consistent with anxiety. He also testified that complaints such as heart skipping beats and vertigo are important complaints.

Neal Edward Chaplin, a senior underwriter for defendant, testified over objection that had the information contained in the doctor's notes for the October 3, 1986, office visit been disclosed by Annemarie on her application for insurance, the underwriting department would not have approved the issuance of a policy to her in the same form as the policy that was issued. It was Chaplin's opinion that defendant would not be able to provide coverage for Annemarie be-

cause "underwriting is the assessment and classification of risk, and Dr. Chowattukunnel's record entry that date [October 3, 1986,] provided no assessment, impression or diagnosis of the symptomology for which he prescribed treatment that day, and without an impression, assessment or diagnosis, we cannot classify the risk. Therefore, we would not assume the risk."

On cross-examination, Chaplin testified that he was not involved in Annemarie's file until he was asked to testify. He acknowledged that the only memo in the file from the underwriting department to the adjusting department did not discuss rescinding or denying coverage but postponing coverage. Chaplin testified that the symptomology that Annemarie described at the October 3, 1986, visit was a consideration in the underwriting decision. Chaplin explained that the underwriting manual does not have a specific section listing symptomology. Rather, the manual gives the underwriters discretionary authority to deviate from prescribed underwriting guidelines in making underwriting determinations.

Following the submission of written closing arguments, the trial court found in favor of the defendant, and this appeal followed.

■ We must first determine if the trial court erred in determining that Neal Chaplin was not an expert witness within the meaning of Supreme Court Rule 220 (107 Ill. 2d R. 220).

Supreme Court Rule 220 provides in pertinent part as follows:

> "An expert is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial. He may be an employee of a party, a party, or an independent contractor." (107 Ill. 2d R. 220(a)(1).)

The rule goes on to require that the identity of such an expert be disclosed "either within 90 days after the substance of the expert's opinion first becomes known to that party or his counsel or, if the substance of the expert's opinion is then known, at the first pretrial conference in the case, whichever is later." (107 Ill. 2d R. 220(b)(1).) The plain language of the rule requires that discovery regarding such expert witnesses be completed not later than 60 days before the trial date and that "[f]ailure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness." 107 Ill. 2d R. 220(b)(1).

This court discussed the purpose of Rule 220 in *Mitchell v. Wayne Corp.* (1989), 180 Ill. App. 3d 796, wherein we stated:

"The purpose of Rule 220 is to facilitate trial preparation by eliminating last-minute disclosure of expert witnesses. [Citation.] The reason for Rule 220 is that adequate trial preparation requires timely disclosure of expert witnesses. Time is needed prior to trial to investigate and discuss the substance of the testimony of an opponent's expert with one's own experts in order to prepare for cross-examination. [Citation.] Rule 220 was therefore adopted in an attempt to establish a uniform, but not inflexible, framework for the timely revelation of the identity of expert witnesses and the subject matter of their testimony. [Citation.] The rule authorizes the establishment of deadlines and requires that the parties act in good faith to ascertain the identity of expert witnesses they reasonably anticipate using." 180 Ill. App. 3d at 800-01.

Defendant argues that Chaplin was not an expert witness and, therefore, was not subject to disclosure under Rule 220, relying on *Smith v. Central Illinois Public Service Co.* (1988), 176 Ill. App. 3d 482. In that case, Smith was injured when he slipped on some ice and fell down the stairs at a plant owned by the defendant. Smith sued, *inter alia*, Sargent, the architectural and engineering firm. Loftus, Sargent's project manager, testified at trial and was asked his professional opinion of the safety of the design of the gallery system. Over objections that he had not been disclosed as an expert witness, Loftus was allowed to give his opinion that the gallery system was safe and complied with all professional standards.

On appeal, the *Smith* court held that Loftus did not need to be disclosed as an expert under Rule 220. The court relied on our supreme court's decision in *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226. In *Tzystuck*, our supreme court held that treating physicians are not experts under Rule 220; rather, they are similar to "occurrence witnesses who testify, not because they were retained in the expectation they might develop and give a particular opinion on a disputed issue at trial, but because they witnessed or participated in the transactions or events that are part of the subject matter of the litigation." (124 Ill. 2d at 234-35.) The *Smith* court then stated as follows:

"These rationales apply in the instant case. Loftus was clearly known as an engineer to plaintiff long before the trial because he was the project manager for Sargent at the Newton Power Plant when [Smith] was injured. Thus, the fact that he testified is not a surprise; rather, that he gave an expert opinion surprised [Smith]. Also, Loftus was not retained as an ex-

pert for litigation. Rather, he was testifying because he was intimately involved in the project as an occurrence witness, long before any litigation was even contemplated. Therefore, we hold that a party, or an employee of a party, who is intimately involved in the subject matter of the litigation need not be disclosed as an expert witness pursuant to Rule 220(b)(1)." *Smith*, 176 Ill. App. 3d at 494-95.

■ Using the above criteria, we are of the opinion that Neal Chaplin was, in fact, an expert witness within the meaning of Rule 220 and, as such, should have been disclosed pursuant to Rule 220. First, the rule contemplates that employees of parties may be considered expert witnesses. (See 107 Ill. 2d R. 220(a)(1).) Unlike the witness in *Smith*, Chaplin's identity was unknown to plaintiffs until he was called as a witness to testify. Chaplin himself testified that he was only made aware of the existence of this case when he was called upon to testify. He did not make the underwriting decision in this case and, therefore, was not so "intimately involved with the subject matter of the litigation" as was the witness in *Smith*. Therefore, the trial court erred in determining that Chaplin was not an expert witness.

■ We note that although the trial court denied plaintiffs' motion to bar Chaplin as an expert witness, the trial was continued in order to allow plaintiffs to take Chaplin's deposition. Given that the clear intent of Rule 220 is to eliminate the very situation which is present here, *i.e.*, the disclosure of an expert in the midst of trial, allowing a party to take the previously undisclosed expert witnesses' testimony in the midst of trial does not remedy the failure to disclose. Chaplin should not have been permitted to give his opinion that defendant would not have issued a health insurance policy to Annemarie.

■ Given that Chaplin's testimony went to the heart of the controversy, *i.e.*, whether defendant would have issued a health insurance policy to Annemarie, we are of the opinion that the error in permitting Chaplin to give his expert opinion on that issue was extremely prejudicial to plaintiffs and requires that she be given a new trial. Since Chaplin's opinion testimony should not have been permitted at the original trial of this matter, the trial court is instructed to bar his opinion testimony at any retrial of this cause.

The judgment of the circuit court is reversed, and the cause is remanded for a new trial in accordance with this court's instructions.

Reversed and remanded with directions.

McLAREN and GEIGER, JJ., concur.