TERRENCE TOTZ *et al.*, Plaintiffs-Appellees, v. CONTINENTAL DU PAGE ACURA, Defendant-Appellant.

Second District No. 2—91—0633

Opinion filed November 3, 1992.

DUNN, J., specially concurring.

Thomas F. Roche, of Halfpenny, Hahn & Roche, of Chicago (John R. Wimmer, of counsel), for appellant.

Lehrer, Flaherty & Canavan, P.C., of Wheaton (Maureen Flaherty, of counsel), for appellees.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Continental Du Page Acura (Continental), appeals from a judgment of the circuit court of Du Page County in favor of plaintiffs, Terrence and Mary Totz (Totzes). Following a bench trial, the court ruled that Continental had violated section 2 of the Consumer Fraud and Deceptive Business Practices Act (Act) (Ill. Rev. Stat. 1989, ch. 121½, par. 262), with regard to the sale of a used car to the Totzes. The court awarded the Totzes $407.50 in compensatory damages, $5,000 in punitive damages, and $19,674.60 in costs and attorney fees. Continental argues on appeal that: (1) the court's determination that Continental violated the Act was against the manifest weight of the evidence; (2) the trial court erred by barring the testi-

mony of an expert witness offered by Continental; (3) Continental's conduct did not justify a punitive damage award; and (4) the award of costs and attorney fees was excessive. We affirm.

Continental operates an automobile dealership in Lisle at which new and used cars are displayed for sale to the public. On May 4, 1989, the Totzes went to Continental and looked at some used cars. They took several for test drives, including a 1984 Honda Accord. Michael Delvin, a Continental used car salesman, dealt with the Totzes that day. Terrence Totz testified that Delvin referred to the Accord as "the cream of the crop." Terrence saw a sticker on the front window of the Accord which stated that the car had undergone a 26-point inspection by a Continental mechanic. He testified that this was very important to him.

The Totzes did not buy the car on May 4 because it was not in their price range. Mike Delvin telephoned the Totzes on May 9, however, and spoke to Terrence. Delvin stated during this conversation that he felt he could get the car in to the Totzes' price range. As a result, Terrence returned to Continental on Saturday May 13.

When Delvin saw Terrence on the 13th, he asked if Terrence wished to take the Accord for another test drive. Terrence and Delvin then took the car out of the dealership. According to Terrence, Delvin told him during this test drive that the car was "in perfect condition" and "[t]he only thing wrong with the car, the radio doesn't work." Delvin also stated again that the car was "the cream of the crop."

When Delvin and Terrence returned to the dealership they began negotiating about the price of the car. Terrence testified that he made an offer for the car and gave Delvin a $100 cash deposit because Delvin asked him to do so. Continental's used car manager, Carmen Buonauro, became involved in the negotiations. Terrence eventually agreed to buy the car for $5,150 plus title and tax, a total of $5,512.62. He gave the dealership an additional $300 in cash and a check for $5,112.62.

Terrence also signed an agreement to purchase the car which provided that the Accord was being sold "as is" and that any deposit was not refundable. He was told to return to Continental later that day to pick up the car. Terrence and Mary returned later and took the Accord home.

The next day, Sunday the 14th, the Totzes noticed that some of the paint on the hood of the Accord appeared to be a slightly different shade of color than the paint on the rest of the car. This made them suspicious. Mary called the bank upon which the check to Conti-

nental was drawn in order to advise it that the Totzes intended to stop payment on the check.

The next morning, Terrence called Continental and spoke to Mike Delvin. He reminded Delvin to contact the previous owner of the vehicle to see if Terrence could obtain the owner's manual. According to Terrence, Delvin agreed to do so and also stated that there was no reason to worry about the car because it had undergone a stringent inspection.

Terrence took the Accord to Village Auto Body in Batavia later that morning. Donald Lowe, who had worked in the automobile body repair area for 19 years, examined the car. He told Terrence that the Accord had been damaged extensively in an accident involving a severe front-end impact which had penetrated to the windshield of the car. Lowe told Terrence that the extensive damage beneath the hood of the car had not been adequately repaired and approximately $5,000 to $6,000 in further repairs should be made. Lowe also told him the dealership knew about the damage from the accident. Terrence then took the car to two other body shops. Mary went to the bank in order to fill out a form to have a stop payment order issued for the check to Continental.

Later that day, the Totzes went back to Continental and confronted Carmen Buonauro. They informed Buonauro that they had taken the car to Lowe's body shop and Lowe had told them that the car had been severely damaged in an accident. It is undisputed that no Continental employee told the Totzes prior to the time they bought the car that it had previously been damaged in an accident. Terrence testified that he would not have agreed to buy the car had he known this.

Buonauro told the Totzes that Continental had not known about the accident and had been told by the prior owner that the car ran fine. After the Totzes told him that they wanted to return the car, Buonauro stated that they had signed for it and were going to take it home. When Terrence then said that there had to be some sort of compromise that could be worked out, Buonauro stated that he would talk to the owner of the dealership the next day. The Totzes also informed Buonauro that they had stopped payment on the check to Continental. Buonauro told them that this was a Federal offense, but he said they should not worry about it.

The next afternoon, Tuesday the 16th, the Totzes returned to Continental with the car. Buonauro had the car taken to the garage area, and he walked over there with the Totzes. At first, according to Terrence, he disputed the Totzes' claim that the car frame was dam-

aged and stated that the Totzes' body shop must have lied to them. When Terrence tried to point out some of the damage under the hood Buonauro walked away and stated that he did not want to see it. Buonauro also stated that it did not matter because they had bought the car "as is."

According to Terrence, Buonauro had the car placed on a lift. Buonauro pointed out some marks on the undercarriage of the Accord and stated that he was not trying to cover up anything. He stated further that the Totzes had bought the car and had no right to return it, but he would allow them to select another car from the lot if they wished to do so.

Terrence testified that Mary then asked what would happen if they left the car at the dealership. Buonauro stated that he would have the car towed to the Totzes' home and would sue them for the towing charges and the remaining amount due on it. The Totzes eventually agreed to take a different 1984 Honda home with them that day. They decided not to keep that car because it had over 117,000 miles on it.

The next day the Totzes returned the second Honda to the dealership. They presented a letter to Buonauro which stated that they had returned the first Honda because they were not aware when they purchased it that the car had been in a major front-end accident. The letter also stated that the Totzes wished to have their $400 deposit returned by the dealership.

Buonauro tore the letter up and threw it away without looking at it, telling the Totzes that it meant nothing to him. The Totzes left the second car and the keys at the dealership, and they left. Buonauro testified that he told the Totzes that the $400 deposit could be applied to any Continental car they chose to purchase during the remainder of the year. Terrence testified that Buonauro never said this to them. The Totzes introduced into evidence one of Continental's copies of the purchase agreement for the Accord. Buonauro had written on this copy, "Cancell [sic] Deal No Refund on 400.00 Carm."

Michael Morrison purchased the Accord as a new car in February 1984. Morrison testified that he was involved in two accidents while driving the car, with the first occurring in June 1984. In that accident the front end of the Accord collided with the side of another car. According to Morrison, the whole front end of the car was damaged, and the fender was "like an accordion." Morrison had the car repaired after this accident and was told it was as good as new.

Morrison characterized the second accident, which took place in 1985, as a minor front-end accident. He had the hood and the front

bumper repaired after this accident. Morrison traded the car in to a Honda dealership in Lisle in 1986. He testified that he informed the dealership that the car had been involved in an accident.

The Honda dealership transferred the car to an affiliated Volvo dealership in Lisle where John Krahulec bought it in 1986. Krahulec did not know when he purchased it that the car had been involved in an accident. Krahulec testified that the car ran well and he never noticed anything wrong with the body of the car. Krahulec had no accidents while he owned the car and had no body work done on it. Krahulec also stated that he looked under the hood of the car shortly before he traded it in. When counsel for the Totzes showed him pictures taken of the area underneath the hood of the car during the short time the Totzes possessed it, Krahulec stated that he did not believe this area was in the same condition when he traded it in to Continental in August 1988. Krahulec traded the Accord in for another used car and found out later that the second car had also been involved in an accident. Continental had not told this to Krahulec.

After the Totzes returned the Accord, Continental sold it to Laura Fischer, the present owner, in June 1989. Before buying the car, she had it inspected by Warren Hunter, a mechanic. Fischer had brought the car in for repairs several times. Once the brakes had to be fixed; another time a minor repair was necessary because the car was stalling frequently; and another time a taillight had to be repaired. Continental did not tell Fischer that the car had been in an accident, nor did it point out the damage beneath the hood of the Accord.

Donald Lowe, who examined the car at Village Auto Body, testified as an expert on the Totzes' behalf. Lowe had worked in the automobile body repair business for 19 years. When Lowe looked under the hood of the car, he noticed a great deal of structural damage to the core support, which is toward the front and holds the radiator, fan shroud and headlights, and the cowl panel, which is in the back.

Lowe also noticed that the wheel house or aprons on both sides were not fastened back or welded the way they should have been. He observed damage to the frame members which are components that hold the front bumper, the steering mechanism, and the motor. Lowe stated that the car had definitely been damaged in an accident and had been recently repaired. He estimated that the repairs had taken place a few weeks or maybe a month before he saw the car. He based this belief primarily upon the fact that he saw some surface rust of recent vintage under the hood. He did not believe the repairs he saw were performed in 1984 or 1985.

Lowe further testified as follows. The quality of the repairs that were done was not adequate and did not meet industry standards. Lowe believed the car was unsafe and could go out of control without warning. He noted that the car was a unibody vehicle, one in which the car does not have a separate frame; the body of the car is its own frame. Therefore, the relationship of each of the components in which he found damage to the frame is important to the smooth functioning of the car. Lowe estimated that $5,000 to $6,000 worth of repairs to the car would be necessary in order to fix the damage properly. He also stated that a person who had been in the car business for 35 years, as had Carmen Buonauro, would have known that the car had been in an accident.

David Pershell testified as an expert on Continental's behalf. Pershell was an insurance appraiser who evaluated damaged vehicles. He had previously operated an automobile body repair shop. Pershell testified that the repairs performed on the car met industry standards, the car was safe to drive, and its structural integrity had not been impaired. He felt that some of the repair work could have been done better, but this was only work that affected the appearance of the car rather than its safety or structural integrity. Continental also sought to call Warren Hunter, the mechanic who examined the car for Laura Fischer, as an expert witness. The Totzes objected on the basis that Hunter had not been disclosed timely as an expert witness under Supreme Court Rule 220 (134 Ill. 2d R. 220). The trial court agreed and barred Hunter's testimony.

The Totzes filed their complaint against Continental in September 1989. In January 1990 they received in the mail a $400 check from Continental along with a letter from Continental general manager, James D'Aoust. The letter explained that the check cleared the credit balance in the Totzes' account for 1989. The Totzes did not cash the check. Sandra Westergren, Continental's office manager, testified that she brought this matter to D'Aoust's attention in December because she noticed the $400 amount in a Continental account which held many customer deposits. None of the other amounts in the account was greater than $25. D'Aoust then authorized the return of the deposit.

The $407.50 compensatory damage award entered by the trial court took into account the $400 deposit and the $7.50 charge to the Totzes for stopping payment on the check to Continental. Continental appeals from that award and the awards of punitive damages, costs, and attorney fees.

Continental's initial contention is that the trial court's judgment was against the manifest weight of the evidence because the evidence did not establish that it violated section 2 of the Act. The manifest weight of the evidence standard is the proper one to employ if a claim is raised on appeal that the evidence was not sufficient to support a judgment entered after a bench trial. (*Bruss v. Klein* (1991), 210 Ill. App. 3d 72, 78.) A judgment is against the manifest weight of the evidence only if a contrary conclusion is evident from the evidence presented at trial. *Bruss*, 210 Ill. App. 3d at 78-79.

Section 2 of the Act states as follows:

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." (Ill. Rev. Stat. 1989, ch. 121½, par. 262.)

Section 10a of the Act (Ill. Rev. Stat. 1989, ch. 121½, par. 270a) permits any person who suffers damage as a result of a violation of the Act to bring suit against the violator.

A violation of section 2 of the Act is established if the plaintiffs show that the defendant is engaged in a trade or commerce and has engaged in deceptive acts or unfair practices. (*Ekl v. Knecht* (1991), 223 Ill. App. 3d 234, 239.) There is no dispute that Continental was engaged in commerce at all relevant times. Continental contends, however, that the Totzes failed to show that it engaged in deceptive acts.

The Totzes argue that they established deceptive actions on Continental's part by showing that Continental failed to disclose the material fact that the car had suffered extensive damage in an accident and made false representations concerning the condition of the car. According to Continental, however, a used car seller has no affirmative duty to disclose any known defects, including damage from an accident. Continental further contends that any statements made by its

agents concerning the Accord's condition were mere puffing or expressions of opinion which are not actionable under the Act.

Continental cites *Henderson v. Martin Burks Chevrolet, Inc.* (1987), 183 Ga. App. 868, 360 S.E.2d 430, in support of its contention that used car dealers have no duty to disclose to a buyer that a vehicle has been damaged in an accident. In *Henderson,* the plaintiff purchased a pickup truck that had been driven about 6,000 miles. The defendant dealership failed to tell the plaintiff that the truck had been damaged extensively in an accident. The trial court granted the defendant a directed verdict in the plaintiff's subsequent common-law fraud action. The appellate court affirmed, stating that the seller of a vehicle that has been used so extensively has no obligation "to gratuitously inform the purchaser of all repairs which may have been done on the vehicle as the result of such use." *Henderson,* 183 Ga. App. at 870, 360 S.E.2d at 432.

*Henderson* involved a common-law fraud action rather than an action pursuant to a consumer fraud statute. The legislature intended the Act to expand the rights of consumers beyond those of the common law and to provide greater protection to consumers than does the common-law action for fraud. (*Harkala v. Wildwood Realty, Inc.* (1990), 200 Ill. App. 3d 447, 453; *Duhl v. Nash Realty Inc.* (1981), 102 Ill. App. 3d 483, 495.) Section 11a states that the Act "shall be liberally construed to effect the purposes thereof." (Ill. Rev. Stat. 1989, ch. 121½, par. 271a.) This section provides a clear mandate to Illinois courts to utilize the Act to the greatest extent possible to eliminate all forms of deceptive or unfair business practices and provide appropriate relief to consumers. (*Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 563.) In light of the above, even if the *Henderson* court was correct in concluding that the dealership's failure to advise the purchaser of the accident damage did not constitute common-law fraud, this would not preclude the existence of a remedy under the Act.

Continental also points out that section 2 of the Act specifically states that, in interpreting the provision, "consideration shall be given to the interpretations of the Federal Trade Commission *** relating to Section 5(a) of the Federal Trade Commission Act." (Ill. Rev. Stat. 1989, ch. 121½, par. 262.) As Continental further notes, the FTC has adopted regulations relating to section 5(a) of the Federal Trade Commission Act (15 U.S.C. §45(a) (1982)), concerning used car sales (see 16 C.F.R. §§455.1 through 455.7 (1991)). Although, in their initial form, these regulations required used car dealers to inform buyers about certain known defects in cars (see 46 Fed. Reg. 41;328 (1981)), the FTC deleted this requirement from the final version of the regula-

tions, which does not recognize any such obligation (see 16 C.F.R. §§455.1 through 455.7 (1991)). Continental argues that, because the FTC regulations do not require the disclosure of known defects in used cars, section 2 of the Act should not be interpreted as imposing any such requirement.

We disagree. While section 2 of the Act states that we must give consideration to relevant FTC interpretations of the Federal Trade Commission Act, it does not state that these interpretations are dispositive. Section 2 states, "the concealment, suppression or omission of any material fact" by a seller is unfair or deceptive if done with the intent that a buyer rely upon it (see Ill. Rev. Stat. 1989, ch. 121½, par. 262). A fact is material if the other party would have acted differently had he or she been aware of it. (*Buechin v. Ogden Chrysler-Plymouth, Inc.* (1987), 159 Ill. App. 3d 237, 249.) The above language from section 2 would clearly suggest that all sellers engaged in a trade or in commerce, including used car dealers, have a duty not to misrepresent known material facts regarding a product to a potential buyer with the intent the buyer rely thereon.

It is noteworthy that section 5(a) of the Federal Trade Commission Act (15 U.S.C. §45(a) (1982)) prohibits unfair or deceptive practices, but does not specify that concealment, suppression, or omission of a material fact is an unfair or deceptive practice, unlike section 2 of the Illinois Act. This would give the FTC leeway to issue regulations indicating that, under certain circumstances, the failure to disclose a material fact would not constitute a deceptive or unfair practice. The last sentence of section 2 of the Act indicates that courts should be guided by FTC interpretations in determining whether business practices are deceptive or unfair under the Act. It does not state, however, that an FTC interpretation should take precedence over the clear language of that same provision in determining whether a practice is deceptive or unfair.

Section 2 of the Act clearly states that it is an unfair or deceptive act if a seller engaged in a trade or in commerce does not advise the potential buyer of a material fact and intends that the potential buyer rely upon the omission. Section 10b (Ill. Rev. Stat. 1989, ch. 121½, par. 270b) mentions certain exceptions to the applicability of the Act but does not exempt used car dealers from any of the Act's requirements. Furthermore, interpreting the Act as exempting used car dealers from the general rule that sellers engaged in a trade or in commerce must disclose known material facts to potential buyers would be contrary to the legislative mandate set forth in section 11a (Ill.

Rev. Stat. 1989, ch. 121½, par. 271a) to construe the Act liberally in order to protect consumers.

For the above reasons, we reject Continental's contention and conclude that a used car dealer that conceals, suppresses, or fails to disclose a material fact to a consumer violates section 2 of the Act if the dealer intended the consumer to rely upon the concealment, suppression, or omission. Here, Continental failed to disclose to the Totzes that the car had previously been extensively damaged in an accident. We must now determine whether the trial court could reasonably have concluded that this was a material fact.

■ The test for determining whether a fact is material in a consumer fraud context is whether knowledge of the fact would have caused the consumer to act differently. (*Buechin v. Ogden Chrysler-Plymouth, Inc.* (1987), 159 Ill. App. 3d 237, 249.) The Totzes presented evidence that the car had been badly damaged in a front-end collision which penetrated to the windshield. Donald Lowe testified that, even though the car had been repaired, there was still significant damage which rendered it unsafe and could cause it to go out of control unexpectedly. According to Lowe's testimony, it would cost between $5,000 and $6,000 to repair the damage properly. Terrence Totz testified that he would not have purchased the car had he known of the accident damage. The above evidence clearly supports a conclusion that the Totzes would not have purchased the car had they known of the extensive accident damage and that Continental therefore failed to disclose a material fact to them.

Under section 2 of the Act, Continental is only liable for failure to disclose a material fact if it intended that the Totzes rely on the omission. Circumstantial evidence may be used to establish the seller's intent in this regard. (*Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 573.) There was ample evidence that some Continental employees knew of the accident damage prior to the time Continental sold the Accord to the Totzes. Carmen Buonauro testified that Continental used cars are inspected by mechanics employed by the dealership. The Accord had a sticker on it stating that Continental had inspected it. Buonauro also testified that he inspected the car prior to the time that the Totzes purchased it, although he denied knowing of the accident damage.

James D'Aoust, Continental's general manager, and John Weinberger, its owner, both testified that, shortly after the instant suit was filed, they inspected the car along with Buonauro. All three could tell that the car had been in an accident; Weinberger stated that he realized this within seconds after the hood was opened. Weinberger

also testified that the Continental mechanic who first inspected the car would probably have known it had been in an accident. Furthermore, Donald Lowe testified that a person who had been in the automobile business for 35 years, as Buonauro had been, would have known that the car had been in an accident.

The above evidence indicates that Continental employees inspected the car before the Totzes bought it and that a cursory inspection would have revealed to one experienced in the automobile business that the Accord had been extensively damaged in an accident. The trial judge could reasonably have concluded that Buonauro was aware of this fact at the time he and Delvin sold the car to the Totzes despite his denial.

Additionally, D'Aoust testified that people are less likely to buy a used car that has been involved in an accident. An individual is presumed to have intended the necessary consequences of his or her conduct. (*Elder v. Coronet Insurance Co.* (1990), 201 Ill. App. 3d 733, 750; *Warren*, 142 Ill. App. 3d at 566.) D'Aoust's testimony indicates that the necessary consequence of Buonauro's failure to tell the Totzes about the Accord's prior accident damage was that the Totzes were more likely to buy the car. Therefore the evidence was sufficient to support a determination that Buonauro deliberately failed to advise the Totzes of a material fact about the Accord with the intent that the Totzes rely upon the omission by deciding to buy the car. Such conduct violates section 2 of the Act.

There was also sufficient evidence to support a conclusion that Continental violated the Act by making misrepresentations about the condition of the Accord to the Totzes. Section 2 states that the "employment of any *** misrepresentation" is unlawful. (Ill. Rev. Stat. 1989, ch. 121½, par. 262.) A party may therefore recover under section 2 of the Act for innocent misrepresentations. (*Harkala v. Wildwood Realty, Inc.* (1990), 200 Ill. App. 3d 447, 453; *Duhl v. Nash Realty Inc.* (1981), 102 Ill. App. 3d 483, 495.) This court has held, however, that section 2 only prohibits the misrepresentation of a material fact. *People ex rel. Hartigan v. Knecht Services, Inc.* (1991), 216 Ill. App. 3d 843, 857.

Continental asserts that the alleged misrepresentations by its agents about the Accord were mere puffing which does not violate the Act. A contention that statements about a product or service constitute puffing is, in effect, an argument that they were nonactionable statements of opinion as opposed to representations of fact. (*In re Diamond Mortgage Co.* (N.D. Ill. 1989), 118 Bankr. 588, 594-95 (denying defendant's summary judgment motion on bankruptcy adversary com-

plaint brought pursuant to Act); see also *People ex rel. Hartigan v. Maclean Hunter Publishing Corp.* (1983), 119 Ill. App. 3d 1049, 1058-59.) Although a seller has some latitude to engage in puffing the product, the seller is not permitted to ascribe virtues to the product that it does not possess. *Diamond Mortgage Co.*, 118 Bankr. at 595.

Whether a representation will be considered a statement of opinion or a factual representation may depend upon the circumstances of the case. (*Buttitta v. Lawrence* (1931), 346 Ill. 164, 172-73; see also *Diamond Mortgage Co.*, 118 Bankr. at 595.) If an individual makes a statement that might otherwise be considered an opinion, but does not specifically express it as his or her opinion, the statement will be considered a factual representation if it would be reasonable for the other party to treat it as such. *Butitta*, 346 Ill. at 173.

According to Terrence Totz, Mike Delvin told him that the Accord was in perfect condition and that the only thing wrong with it was that the radio did not work. By this time, Terrence had seen the sticker on the car window stating that the car had undergone a 26-point inspection by a Continental mechanic. There was no indication that Delvin's statements were mere expressions of his opinion. According to Terrence, Delvin went beyond making general statements praising the car and made a statement that a reasonable consumer would have interpreted as a factual statement that the car was free of serious defects. The inspection sticker would have led a reasonable consumer to believe that this representation was based upon more than Delvin's opinion.

■ Because there was evidence that the Accord had experienced extensive damage, the trial court could reasonably have concluded that Delvin made a misrepresentation to Terrence by stating that the car had a virtue that it did not possess, the virtue of having not experienced extensive damage. It is axiomatic that a representation the car had not experienced extensive damage would constitute a misrepresentation of a material fact because the Totzes reasonably treated the representation as such. The evidence was therefore sufficient to support a conclusion that Continental violated the Act by making an affirmative misrepresentation of a material fact and by failing to disclose a material fact.

Continental next contends that the trial court erred by barring the testimony of Warren Hunter because Continental failed to comply with the disclosure deadlines for expert witnesses set forth in Supreme Court Rule 220(b)(1) (134 Ill. 2d R. 220(b)(1)). We agree that Hunter was not a Rule 220 expert, but we do not believe the defendant was prejudiced by the court's barring Hunter's opinion testimony.

Rule 220(b)(1) states in part that "an expert *who is retained* to render an opinion at trial" must be disclosed either within 90 days of the date on which the substance of the expert's opinion is first known to the party or the party's attorney, or at the first pretrial conference, whichever is later. (Emphasis added.) (134 Ill. 2d R. 220(b)(1).) The rule also states that, as to any expert witnesses not disclosed previously, the trial court shall establish a schedule of dates by which they must be disclosed and shall choose dates which will ensure that discovery regarding all experts will be completed at least 60 days prior to trial. 134 Ill. 2d R. 220(b)(1).

Continental contends that the Rule 220(b)(1) deadlines are not applicable because Hunter was not retained by Continental to examine the Accord for the purpose of rendering an opinion at trial. Instead, Hunter was originally retained by a nonparty, Laura Fischer, to inspect the car and provide an opinion so that she could decide whether to buy the car.

Continental correctly cites *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 234-35, in which our supreme court determined that the disclosure requirements of Rule 220(b)(1) do not apply to an expert who is not retained solely to render an expert opinion regarding the cause.

In a number of cases, the appellate court has applied the *Tzystuck* rationale to expert witnesses who were not treating physicians and has held that Rule 220(b)(1) was inapplicable. (See, *e.g., Moore v. Roberts* (1991), 217 Ill. App. 3d 446, 453-54 (horse owner and jockey); *Cleveland Wrecking Co. v. Central National Bank* (1991), 216 Ill. App. 3d 279, 295 (structural engineer); *First National Bank v. Village of Mount Prospect* (1990), 197 Ill. App. 3d 855, 863-64 (former village planner); *Voyles v. Sanford* (1989), 183 Ill. App. 3d 833, 836 (truck driver); *Smith v. Central Illinois Public Service Co.* (1988), 176 Ill. App. 3d 482, 494-95 (engineer).) In each of these cases the expert originally gained knowledge about the subject matter of the litigation for some purpose other than to render an opinion at trial.

The above cases represent the views of the Appellate Court for the First, Third, and Fourth Districts. The Appellate Court for the Second District has expressed a similar view in four cases. (See *Forest Preserve District v. Brookwood Land Venture* (1990), 199 Ill. App. 3d 973, 981; *Beiermann v. Edwards* (1990), 193 Ill. App. 3d 968, 977-78; *Hill v. Ben Franklin Savings & Loan Association* (1988), 177 Ill. App. 3d 51, 57-58.) In *Hill*, this court held that the plaintiff landowner was not barred from giving an opinion at trial as to the value of his land because he was not an expert witness as that term is de-

fined in Rule 220(a)(1). (*Hill*, 177 Ill. App. 3d at 57.) The court went on to state in *dictum* that, even if the plaintiff was an expert witness, disclosure was not required under Rule 220(b)(1) because he was not an expert who was retained for the purpose of rendering an opinion at trial. 177 Ill. App. 3d at 57-58.

In *Brookwood Land Venture*, this court held that three witnesses who "had participated in the \*\*\* history" of the subject property could give their opinions at trial as to the value of the land even though they were not disclosed as expert witnesses. (*Brookwood Land Venture*, 199 Ill. App. 3d at 981.) The court stated that disclosure was unnecessary because the witnesses did not originally form their opinions in anticipation of trial. 199 Ill. App. 3d at 981.

The plaintiff in *Beiermann* filed an action for personal injuries as a result of an automobile accident with the defendant. At the time, plaintiff was engaged in his duties as an employee of the State of Illinois, which filed a complaint for intervention. The State had the plaintiff see a physician for the purpose of evaluating the plaintiff's worker's compensation claim and recommending treatment and therapy. The trial court allowed the defendant to introduce opinion testimony from the doctor's evidence deposition despite the fact that he had not been disclosed as an expert witness. (*Beiermann*, 193 Ill. App. 3d at 970-74.) This court affirmed, noting that the physician's relationship with the plaintiff "was more in the nature of a treating physician than a physician hired to give an opinion at trial" because the doctor had been sought out to recommend treatment and therapy. (193 Ill. App. 3d at 978.) This language would indicate that the court felt that the *Tzystuck* holding was directly applicable and was not extending *Tzystuck* outside the context of a treating physician. There is other language in *Beiermann*, however, which is arguably *dictum*, that suggests that, even if the physician was not a treating doctor, Rule 220(b)(1) was not applicable because he was not originally retained to render an opinion at trial. 193 Ill. App. 3d at 978.

In *Hatch v. Golden Rule Insurance Co.* (1990), 204 Ill. App. 3d 790, this court determined that an employee senior underwriter's testimony should have been barred because he *was retained* solely to render an opinion regarding the cause of action.

The Appellate Court for the Fifth District has recently concluded that the *Tzystuck* rationale should no longer be applied when the witness is not a treating physician and that Rule 220 requires the disclosure of all other witnesses who give expert testimony regardless of whether they originally gained knowledge about the subject matter of the litigation for the purpose of rendering an opinion at trial. (*Wake-*

*ford v. Rodehouse Restaurants of Missouri, Inc.* (1991), 223 Ill. App. 3d 31, 39-40.) The court in *Wakeford* reached this conclusion after examining the purposes of Rule 220 and the factors mentioned by the supreme court in support of the *Tzystuck* holding. The expert in *Wakeford* was called upon to render an opinion outside of his normal duties of investigating a crime as a police officer. The *Wakeford* case is factually distinguishable in at least two important aspects. First, Hunter was retained by a *third* party to render his opinions. Second, his testimony would have been within the ambit of what was reasonably expected considering his connection to the cause of action.

██ The Totzes claim they were surprised because of noncompliance with Rule 220. If the Totzes had acted promptly in employing general discovery tools to discover the identity of Continental's witnesses, we doubt the Totzes would have been surprised by the last-minute disclosure of Hunter or his testimony. In *Smith*, the first case to extend *Tzystuck* to experts who were not treating physicians, the court stated with regard to the expert in question, "the fact that he testified is not a surprise; rather that he gave an expert opinion surprised plaintiff." (*Smith*, 176 Ill. App. 3d at 494-95.) In the instant case, Hunter's testimony would not have been a surprise but for the Totzes' failure to update discovery. Additionally, the Totzes should not have been surprised that he had an expert opinion because he examined the vehicle in order to render an expert opinion to Laura Fischer. Thus, the alleged surprise which Rule 220 is designed to prevent was both self-inflicted and preventable under basic discovery procedures.

In light of the above, we do not deem the error committed in barring Hunter's testimony as reversible error. First, the defendant has not mentioned nor directed this court to an offer of proof setting forth what Hunter would have testified to had he been allowed to testify. Thus, defendant has not properly presented this court with a sufficient record to establish prejudice. *Brennan v. Wisconsin Central Ltd.* (1992), 227 Ill. App. 3d 1070, 1083.

Furthermore, we doubt that Hunter's testimony would have been material or would have affected the outcome of the trial. As we stated previously, the defendants were found to have made false representations concerning the condition of the car and failed to disclose the material fact that the car had suffered extensive damage in an accident. Hunter's testimony as best we can determine would have related only to the car's repair and not to any representations made outside Hunter's presence. Continental has failed to establish how Hunter's opinions are material as whether or not the car is "the

cream of the crop," "in perfect condition," or "that the only thing wrong with the car, the radio doesn't work." Due to defendant's failure to establish prejudice, we deem no reversible error occurred in barring Hunter's testimony.

Continental next contends that the trial court abused its discretion by awarding punitive damages to the Totzes. Punitive damages may only be awarded for conduct which is outrageous either because the defendant's motive was evil or the acts exhibited a reckless indifference toward the rights of others. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 415-16.) The purposes of awarding punitive damages are to punish the wrongdoer and to deter that party and others from committing similar wrongful acts. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 203.) Continental's sole contention regarding punitive damages is that the award was inappropriate because the dealership had no prior warning that its conduct could be actionable.

In advancing this argument, Continental relies primarily upon *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172. In *Kelsay*, our supreme court recognized the tort of retaliatory discharge for the first time. (*Kelsay*, 74 Ill. 2d at 181-85.) The court reversed a $25,000 punitive damage award on the basis that the cause of action was a novel one, and the defendant had no reason to believe that its conduct was actionable at the time it discharged the plaintiff. (74 Ill. 2d at 189.) Under these circumstances, the court felt that an assessment of punitive damages was unfair. 74 Ill. 2d at 189.

■ We do not agree with Continental's claim that its situation is analogous to that of the defendant in *Kelsay*. The statutory cause of action brought against Continental pursuant to the Act was hardly novel at the time of the alleged conduct; the Act became effective in 1973 (see Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*). Continental's position that used car dealers may misrepresent material facts regarding a car, including prior accident damage, to a buyer, was supported to some extent by the Federal regulations and the Georgia case that it cited. In our view, however, the clear language of section 2 of the Act (Ill. Rev. Stat. 1989, ch. 121½, par. 262) was sufficient to place Continental on notice that failing to disclose a material fact with the intent that the buyer rely on the omission is actionable in Illinois.

Furthermore, we have determined that the evidence was sufficient to support a conclusion that Continental violated the Act by making a misrepresentation to the Totzes about the condition of the car. The authorities cited by Continental could not have reasonably caused a used car dealer to believe that a fraudulent misrepresentation to a buyer would not be actionable. We therefore reject Continen-

tal's argument and hold that the trial court's decision to award punitive damages was proper.

Finally, Continental contends that the amount of attorney fees awarded to the Totzes, $17,625, was excessive when compared to the $407.50 compensatory damage award. Section 10a(c) of the Act (Ill. Rev. Stat. 1989, ch. 121½, par. 270a(c)) states that, in an action brought pursuant to the Act, the trial court may award attorney fees to the prevailing party. The decision as to whether fees should be awarded and in what amount rests within the sound discretion of the trial court. *Ekl*, 223 Ill. App. 3d at 245; *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 582.

■ The factors to be considered in determining the amount of attorney fees to be awarded to a prevailing party in a case brought pursuant to the Act include the time and labor required, the novelty and difficulty of the questions involved, the experience and ability of the prevailing party's attorney, the skill necessary to perform the legal services that were provided, and the benefits resulting to the prevailing party. (See *Kleidon v. Rizza Chevrolet, Inc.* (1988), 173 Ill. App. 3d 116, 124; *Warren*, 142 Ill. App. 3d at 582.) The factors other than the one cited by Continental would appear to justify the amount of attorney fees awarded. The instant case was complex with respect to the factual and legal issues presented. It unquestionably required attorneys who were well versed and skilled in consumer fraud litigation. Furthermore, the record reveals that Continental strongly contested the allegations against it.

As Continental points out, the fee award was over 40 times greater than the compensatory damage award. This was not, however, the only benefit the Totzes derived from the litigation; they also received a $5,000 punitive damage award. Additionally, this court has recognized that one of the purposes of allowing attorney fees to be awarded under section 10a(c) to prevailing parties is to encourage consumers to bring actions to vindicate their rights under the Act. (*Ekl*, 223 Ill. App. 3d at 245.) Without such a provision, it would be difficult for injured consumers to obtain counsel in light of the sums of money that are in dispute in most consumer fraud litigation.

Thus, section 10a(c) is a vital provision of the Act which enables consumers to vindicate their rights in many instances. This, in turn, benefits society in general, resulting in greater deterrence of fraudulent and deceptive business practices. In our view, the benefit to the public from encouraging consumer fraud litigation in appropriate cases is another factor that should be considered in determining the reasonableness of fee awards under section 10a(c).

We believe this public interest factor is compelling in the instant case, which involved the purchase of an automobile, one of the most important and expensive items purchased by consumers. When the benefit to the Totzes from the punitive damage award and the above public benefit are considered, we cannot say the attorney fee award was an abuse of discretion.

Continental also cites *Grimes v. Adlesperger* (1978), 67 Ill. App. 3d 582, in support of its contention that the fee award was improper. In *Grimes*, the court held that the trial court did not abuse its discretion by refusing to award attorney fees to a plaintiff who prevailed in an action brought pursuant to the Act. (*Grimes*, 67 Ill. App. 3d at 586.) The court stated in *Grimes* that the trial court acted properly because the defendants had reasonable grounds to believe their position was valid and they were not guilty of an intentional or concerted effort to deceive the plaintiff. (67 Ill. App. 3d at 586.) By contrast, in the case at bar, there was evidence that Continental deliberately withheld material information from the Totzes and deceived them as to the condition of the car. We therefore find *Grimes* to be distinguishable and reject Continental's contention.

For the above reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

WOODWARD, J., concurs.

JUSTICE DUNN, specially concurring:
I write separately solely to express my agreement with the trial court's ruling barring the testimony of Warren Hunter because Continental did not disclose Hunter as an expert witness within the deadlines set forth in Supreme Court Rule 220(b)(1) (134 Ill. 2d R. 220(b)(1)). I agree with the conclusions and reasoning of the majority with respect to all other issues.

In concluding that the disclosure requirements of Rule 220(b)(1) did not apply to Hunter, the majority relies upon appellate court cases which have extended the supreme court's holding in *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, to expert witnesses other than treating physicians. One of the factors cited by the *Tzystuck* court in support of this holding is that a defendant can easily discover the identities and opinions of a plaintiff's treating physicians through the use of general discovery procedures; therefore, a defend-

ant should not be surprised by the medical testimony of a treating physician at trial. *Tzystuck*, 124 Ill. 2d at 238.

This same logic does not necessarily apply to other types of expert witnesses who originally gained knowledge about the subject matter of the case for some purpose other than to testify at trial. Here, Warren Hunter was asked by Laura Fischer, who was not a party to this case, to look at the car. Thus, neither party to this action would have been aware of his identity at the time the instant lawsuit was filed.

Continental did disclose Hunter's identity to the Totzes well in advance of trial but not as an expert witness. Under the majority's holding and the other cases extending *Tzystuck* to expert witnesses other than treating physicians, Continental could have called Hunter as an expert witness even if it had not disclosed his identity as an expert witness until the eve of trial. This is completely unfair and subverts the intent of Rule 220.

The primary purpose of Rule 220 is to prevent surprise opinion testimony. (*Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1991), 223 Ill. App. 3d 31, 40.) Extending *Tzystuck* to expert witnesses other than treating physicians facilitates the use of surprise opinion testimony. The potential impact upon an unwary adversary of testimony from an undisclosed expert can be devastating. (*Wakeford*, 223 Ill. App. 3d at 40.) Therefore, I do not believe that *Tzystuck* should be applied to expert witnesses other than treating physicians.

Furthermore, Rule 220 is designed to ensure that the parties and their attorneys are "adequately advised regarding the critical opinions which may be offered in support of their opponent's claims or defenses." (Ill. Ann. Stat., ch. 110A, par. 220, Committee Comments, at 438 (Smith-Hurd 1985), quoted in *Oldenburg v. Hagemann* (1991), 207 Ill. App. 3d 315, 326.) Although Continental made the Totzes aware of Hunter's identity, it did not make them aware until the eve of trial that Hunter's opinion would be offered in support of Continental's position at trial that the car was not defective.

Revealing the identity of an expert is not sufficient to comply with Rule 220; the party must also reveal his or her intention to call that expert as a witness. (*Illinois State Toll Highway Authority v. West Suburban Bank* (1991), 208 Ill. App. 3d 923, 926; *Oldenburg*, 207 Ill. App. 3d at 327.) This minimizes the necessity for guessing about matters such as whether an adversary will call a potential expert witness, whether it is necessary to take that potential expert's deposition, and whether contrary expert testimony should be sought. The

cases extending *Tzystuck* to expert witnesses other than treating physicians fail to address this concern.

For the above reasons, I would conclude, as the trial judge did, that Continental was required to disclose Hunter as an expert witness within the deadlines set forth in Rule 220(b)(1).