DIANE P. WOOD, Circuit Judge,
concurring.
Although I agree with the majority’s ultimate disposition of this case, my reasons differ in one significant respect from theirs. The majority finds that none of the three statements on which Bober based his claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (CFA), 815 ILCS 505/1 et seq., is deceptive. For the reasons I explain below, I believe this gives too cramped a reading to Illinois’s CFA. In my opinion, plaintiff Estelle Bober, representing the Estate of Mortimer Bober and others similarly situated, has stated at least one claim under the CFA. I do agree, however, with the majority’s alternative argument in Part II.B. of its opinion that the three statements Glaxo made feh within the boundaries permitted by the Food and Drug Administration and thus were excluded from CFA liability pursuant to section 10b(l) of the CFA, 815 ILCS 505/10b(l). I am therefore happy to concur in the result.
As the majority initially acknowledges, we are dealing with three separate statements that the plaintiffs claim were deceptive or misleading for purposes of the Illinois CFA. These statements were made at different times, and in one instance through an entirely different medium. The first statement was made by the hotline operator to whom Mr. Bober first spoke. The operator, according to the complaint (which we do not second-guess at this stage), told Mr. Bober two things: that Zantac 75 and Zantac 150 were not “the same medications,” and that Mr. Bo-ber could not substitute two Zantac 75 tablets for one Zantac 150 tablet. I refer to this as the “operator” statement. The second statement was contained in a recorded message that Mr. Bober reached when he made a second telephone call (“the recorded statement”). That one said nothing about the comparison between Zantac 75 and Zantac 150, but it advised him that if his doctor “ha[d] directed [him] *944 to take prescription Zantac, [he] should not substitute Zantac 75 for [his] prescription.” The third and last statement was found on the web site that Warner Lambert maintains (“the web site statement”). In a section of the site devoted to “frequently asked questions,” Mr. Bober found the following statement: “If your physician has prescribed a medicine, you should not substitute any other medicine for your prescription. You should always ask your physician any questions you may have about changing your medication.”
Although the majority acknowledges that these were three representations made at three different times, it analyzes the Bober claim as if he either heard everything at once or as if no individual statement could be deceptive for CFA purposes if the aggregate of everything the defendants said about Zantac would ultimately have given an accurate picture. Indeed, at page 938, ante, the majority squarely states that “to the extent that anyone could imply from the statements at issue that the drugs contain different medicine, information available to Zantac users, and in Bober’s possession, would dispel any such implication.” In apparent support of that point, it then cites two Illinois cases for the broad proposition that the claim of deception had to be assessed in light of all available information, even information that Mr. Bober might not have seen personally. See Tudor v. Jewel Food Stores, 288 Ill.App.3d 207, 224 Ill.Dec. 24, 681 N.E.2d 6 (1997); Saunders v. Michigan Ave. Nat’l Bank, 278 Ill.App.3d 307, 214 Ill.Dec. 1036, 662 N.E.2d 602 (1996).
But neither Tudor nor Saunders stands for such a sweeping rule. In both these cases, all of the relevant information that the court thought should be taken into account when assessing deceptiveness was given to the plaintiff at the time of the disputed transaction. Even if we can assume that consumers will assimilate all the information they are given on a given occasion, I find no Illinois case holding that a company can avoid potential liability for deceptive statements if it has buried further explanatory material on a web site or in a brochure that some consumers may never see. It is even worse if, as here, the absent information would only potentially save an otherwise misleading statement. I am quite troubled by the implication one could draw from the majority’s opinion that consumers have such an unbounded duty of inquiry. Such a holding would be inconsistent with Illinois’s understanding of its own law, which requires that the statute be interpreted in a way consistent with its strong consumer protection purpose. What if Mr. Bober had stopped with the first telephone call, and never heard the recorded message? What if he had no access to a computer, or was not comfortable using one, and thus never visited the web site? The only answer that I can give to these questions is that Illinois law recognizes these risks and that is why it requires each separate statement to be assessed on its own. As was the case in Saunders and Tudor, relevant context is limited to particular occasions.
Looking at each of the statements individually, I agree with the majority that the recorded statement and the web site statement were not misleading. The recorded message merely advised callers to consult with their physicians if the doctor had prescribed Zantac 150, before going ahead and using Zantac 75 as a substitute. This is precisely what counsel for the Bober group insisted at oral argument was necessary and sufficient as a matter of law, and I agree with my two colleagues that there is nothing misleading in such a statement. Even if we approach this case as one in which two Zantac 75 tablets and one Zantac 150 tablet both deliver the same amount of ranitidine in the same way (which is a contested fact at this *945 point), it remains true that prescription strength medication and non-prescription medication differ in important respects not related to the active ingredient. As the majority points out, there are different testing and approval procedures necessary for the different dosage levels of the identical medication. Perhaps more importantly, prescription medications as a practical matter give the patient a package of product and service: the product is the 150 mg. of ranitidine, and the service is a combination of the pharmacist’s monitoring of dosage quality, amounts, potential interactions with other prescription drugs known to the pharmacy, and advice, and the doctor’s ability to conduct similar medical monitoring, to the extent the patient needs to report back for prescription refills from time to time. Those kinds of services from the pharmacist cost money, just as any other retail-level service does. Cf. Lester G. Tesler, Why Should Manufacturers Want Fair Trade?, 3 J.L. & Econ. 86 (1960) (explaining the relationship between retail price maintenance and the provision of retail services); Benjamin Klein & Kevin M. Murphy, Vertical Restraints as Contract Enforcement Mechanisms, 31 J.L. & Econ. 265 (1988); Thomas G. Krattenmaker & Steven C. Salop, Anticompetitive Exclusion: Raising Rivals’ Costs to Achieve Power Over Price, 96 Yale L.J. 209 (1986). It is therefore not surprising that the version of the product that comes securely tied to a high level of service costs more than the “discount” version. A simple recorded message that tells the patient not to substitute until he or she finds out why the doctor made a particular choice is not misleading.
The same analysis applies to the statement on the web site. Once again, it cautions the reader to check with the physician before making any changes in medication. And once again, apart from matching what we understand plaintiffs now to be arguing, this advice reflects the accurate fact that the physician may have had good and sufficient reasons to prefer the prescription form of the drug. (Perhaps the physician does not care; but the web site leaves open the possibility that the physician may authorize substitution of the non-prescription form. It in no way hints that this would be out of the question.)
The operator, however, gave Mr. Bober a different message. That message had two parts, both of which I find problematic. First, the operator said that Zantac 75 and Zantac 150 were not the “same medications”; second, he or she said that Mr. Bober “could not” substitute one for the other. From the layperson’s point of view, which Illinois law requires us to use, see, e.g. Daley v. Datacom Sys., Corp., 146 Ill.2d 1, 165 Ill.Dec. 655, 585 N.E.2d 51, 66 (1991) (affirming appeals court ruling that demand letters could have misled the parking violators who received them), both of these representations might be shown to be misleading. Even if someone who had spent a career in the pharmaceutical industry would recognize that as a matter of federal regulation the two forms of Zantac are different “medications,” see the majority’s discussion at page 941, ante, a trier of fact might well conclude that an average consumer, asking whether she could substitute the products, would be misled by the statement “they are different medications” into believing that Zantac 75 could in no circumstances be used to treat the illness for which she was taking Zantac 150. Webster’s Third New International Dictionary defines the term “medication” to mean, among other things, “a medicinal substance: medicament.” Webster’s Third New International Dictionary of the English Language Unabridged 1402 (1993). The word “medicament” in turn is defined as “a substance (as a chemical, a medicine, or an ointment) used in therapy.” Id. And finally, the first definition of the word “medicine” is “a substance or *946 preparation used in treating disease.” Id. At a pragmatic level, therefore, given that Zantac 75 and Zantac 150 have the same active ingredient and, as we must assume here, might both be used to treat the same disease, the average consumer could surely consider them to be the same medication and would be misled if told otherwise. There is a difference in form that might matter, but the person who heard only the operator’s message would be misled — or so a finder of fact could conclude. Cf. Daley, 165 Ill.Dec. 655, 585 N.E.2d at 66 (emphasizing that whether a statement is misleading is “a factual issue which must be decided by the trier of fact.”); Gammon v. GC Services L.P., 27 F.3d 1254, 1259 (7th Cir.1994) (Easterbrook, J., concurring) (agreeing that “the trier of fact must inquire whether a misleading implication arises from an objectively reasonable reading of [a] communication” allegedly made in violation of a federal consumer credit protection statute); United States v. Kaadt, 171 F.2d 600, 604 (7th Cir.1948) (treating question of whether drug label is misleading as issue for the trier of fact).
The average consumer could also be misled by the flat statement that one “could not” substitute Zantac 75 for Zantac 150. Understood literally, this is simply not true. With the doctor’s authorization, substitution certainly is possible, as both the recorded message and the web site conceded. But that qualification was not given by the operator. A more trusting caller might simply give up the quest and never even think to raise the subject with her doctor.
As an initial matter, therefore, I would find that the Bober plaintiffs raised a genuine issue of fact about the deceptive nature of the operator statement and therefore stated a claim under the CFA. This statement was not a mere statement of opinion for CFA purposes, because (a trier of fact could find) it was made in such a way that the consumer could reasonably treat it as a statement of fact. See Totz v. Continental DuPage Acura, 236 Ill.App.3d 891, 177 Ill.Dec. 202, 602 N.E.2d 1374, 1383 (1992); Duhl v. Nash Realty Inc., 102 Ill.App.3d 483, 57 Ill.Dec. 904, 429 N.E.2d 1267, 1277 (1982).
It is important that we do not, in our zeal to respect the limits federal law places on the pharmaceutical industry, adopt an impermissibly narrow interpretation of a general state law like the CFA that protects consumers in every market from acupuncture to zippers. In my opinion, the majority has made just such a misstep, and I therefore respectfully register my disagreement with that part of its opinion.