TERRY EKL *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. JAMES M. KNECHT, Defendant-Appellant and Cross-Appellee.

Second District No. 2—91—0073

Opinion filed December 30, 1991.

236

Richard K. Wray, of Keck, Mahin & Cate, of Chicago (Shari L. Friedman, of counsel), for appellant.

Connolly, Ekl & Williams, P.C., of Clarendon Hills (Michael S. Cetina, of counsel), for appellees.

JUSTICE DUNN delivered the opinion of the court:

Plaintiffs, Terry and Carrie Ekl, filed a complaint alleging that defendant, James Knecht, violated the Consumer Fraud and Deceptive Business Practices Act (Act) (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*). Following a bench trial, the circuit court of Du Page County awarded plaintiffs $307 in compensatory damages and $4,700 in punitive damages. Defendant appeals and contends as follows: (1) that the trial court erred by ruling that a combination of defendant's high prices and his failure to disclose those prices prior to performing the requested plumbing services violated the Act; (2) that the punitive damage award was excessive; and (3) that, in awarding punitive damages, the circuit court improperly considered certain testimony that had been stricken. Plaintiffs cross-appeal and argue that the court abused its discretion by denying their request for attorney fees pursuant to the Act. We affirm.

The following facts were brought out at trial. Knecht was the president, majority shareholder, and sole full-time employee of Knecht Services, Inc., which did business under the assumed name of AAA Knecht. The company, which operated out of Knecht's home in Clarendon Hills, was engaged in the business of repairing plumbing fixtures and heating, ventilation, and air conditioning systems. Defendant was a licensed apprentice plumber.

The Ekls lived in a six-bedroom home in Clarendon Hills along with their three children. On the morning of December 10, 1988, a Saturday, Carrie Ekl called AAA Knecht because one of the three bathtubs in her home was draining slowly. Knecht's wife, Elizabeth, took the call and stated that someone could probably be sent to the Ekl home that afternoon. Elizabeth Knecht then called defendant, who was working at a home in Darien, along with his helper, Reginald Wagner.

Defendant called Carrie Ekl to confirm that she wanted the work done. After completing the job in Darien, defendant and Wagner went to the Ekl residence. Defendant's right leg was in a cast at the time and he was using crutches because of an injury to his achilles tendon.

Sometime after their arrival, Carrie told them about the problem and also mentioned that her husband had left town to go skiing.

The drainage problem resulted from an obstruction in a section of pipe in the Ekl basement. Defendant and Wagner found the obstruction by cutting the pipe open with a hacksaw. They found and removed a small piece of plastic that apparently came from a toy belonging to one of the Ekl children. They then replaced the pipe that had been sawed off and installed a device called a PVC trap and tail assembly which could be easily removed and put back in if there was any future blockage.

After completing the repair, defendant prepared the invoice and presented it to Carrie Ekl. The total charge was $480. Carrie testified that she told defendant that the bill was ridiculous and the amount of money defendant was charging was outrageous. Defendant told her that she was to pay that amount.

Carrie further testified as follows. She asked Knecht if she could send a check on Monday after her husband had a chance to review the bill. Defendant stated that if Carrie did not pay him, he would undo the work and turn off the water in the Ekl home. Carrie then found her checkbook and wrote out a check to defendant in the amount of $480. She did this because she was afraid of him. According to Carrie, defendant and Wagner were in her home for 60 to 90 minutes.

When defendant testified, he denied ever threatening Carrie Ekl or any other customer. He also stated that she had not objected to the amount of the bill. Reginald Wagner corroborated defendant's testimony in this respect. According to defendant, he and Wagner were at the Ekl home for two hours.

Terry Ekl returned home on Sunday, December 11. The next day he sent a letter to Knecht in which he requested a breakdown of his charges. There was no such breakdown on the invoice. The Ekls never received a response to the letter. The Ekls attempted to stop payment on the check Carrie had given defendant but Elizabeth Knecht had cashed the check on December 10.

Defendant testified that as of the time of the Ekl job, his minimal hourly rate was $59. Same-day service on Monday through Friday was billed at time and a half. Defendant charged double for same-day service on the weekends. Additionally, he billed a minimum of one hour of travel time for each job regardless of where the customer lived. Defendant's two primary competitors were Econotemp, Inc., and Dunrite Plumbing. According to defendant's testimony the rate he charged the Ekls was about $3\frac{1}{2}$ times the rate charged by Dunrite,

which only bills straight time. Defendant also testified that Econo-temp generally charges $40 per hour.

For the Ekl job, defendant charged $118 per hour for his services and $30 per hour for Wagner's. He charged the Ekls for three hours of time, two hours at the Ekl residence and one hour of travel time. He added on a charge of $36 for the materials used to replace the pipe that was sawed off. Terry Ekl testified that he bought the same materials at a hardware store for $3.94. Defendant did not give Carrie Ekl an estimate or quote her his hourly rates before completing the work, nor did she inquire about those rates.

Two witnesses called by plaintiffs testified that defendant has a poor reputation for truth and veracity in Clarendon Hills. A minister called by defendant testified to the contrary. Susan Lindquist testified that defendant went to her home in Westmont and repaired her furnace on March 1, 1987. Lindquist asked why the invoice was so high. She then asked if defendant could bill her because she lacked sufficient funds to pay the invoice. Lindquist used a credit card to pay because defendant told her that if she did not pay immediately, he would remove the copper coil he had placed in the furnace.

Lindquist had previously testified against defendant at the trial of an action brought against defendant and Knecht Services, Inc., by the Illinois Attorney General in 1987 alleging numerous violations of the Act. After a lengthy bench trial in 1989, the circuit court of Du Page County ruled in defendants' favor on several counts in the Attorney General's suit. The court found in plaintiff's favor on one count, ruling that defendants had violated the Act by charging rates much higher than competitors' rates and failing to advise some customers of those rates prior to performing the requested services. The circuit court imposed a civil fine of $10,000 against defendants and entered a mandatory injunction requiring defendants, among other things, to disclose their rates to customers prior to doing any work. This court recently affirmed the circuit court's judgment order in the Attorney General's action although our reasoning differed from that employed by the circuit court. See *People ex rel. Hartigan v. Knecht Services, Inc.* (1991), 216 Ill. App. 3d 843.

While testifying as an adverse witness in the present case, defendant testified that he raised his minimum hourly charge to $69 in 1989 because of the expenses resulting from the Attorney General's action. After defendant finished testifying as an adverse witness, the trial court struck the above testimony on the basis that it was irrelevant. While announcing the judgment, the trial judge stated

that he had reconsidered and reversed his prior ruling striking the above testimony.

The trial judge ruled that defendant had violated the Act by charging excessive rates and failing to advise Carrie Ekl of those rates prior to commencing work. The judge found that defendant had threatened Mrs. Ekl and based the punitive damage award upon the threat and defendant's testimony that he increased his rates in 1989 because of expenses resulting from the lawsuit brought by the Attorney General. The court denied plaintiffs' request for attorney fees under section 10a(c) of the Act (Ill. Rev. Stat. 1989, ch. 121½, par. 270a(c)). Defendant now appeals, and plaintiffs cross-appeal.

Defendant first challenges the trial court's determination that he violated section 2 of the Act (Ill. Rev. Stat. 1989, ch. 121½, par. 262). That provision states as follows:

"Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, *** in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." Ill. Rev. Stat. 1989, ch. 121½, par. 262.

■ A violation of section 2 of the Act is established if the plaintiffs show that defendant is engaged in a trade or commerce and has committed acts or engaged in practices which are either unfair or deceptive. (*People ex rel. Hartigan v. Knecht Services, Inc.* (1991), 216 Ill. App. 3d 843, 853.) It is undisputed that defendant is engaged in a trade and in commerce. Defendant contends, however, that the trial court erred by concluding that he violated the Act by committing deceptive acts.

According to defendant, a tradesperson's failure to disclose his or her rates prior to performing services does not violate the Act absent a special relationship between the parties which is not present here. Defendant also asserts that a tradesperson's high prices do not violate the Act unless the services performed have little or no value. Under defendant's analysis, the parties entered into an implied-in-fact contract pursuant to which defendant agreed to perform the requested

plumbing services and Carrie Ekl agreed to pay his regular charges. Defendant argues that, in the absence of a finding that his prices were unconscionable, the trial court's action constitutes an unwarranted interference with the parties' contract, as the Act was not intended to protect consumers from their own carelessness in negotiating contracts.

■■ Implied-in-fact contracts arise from promissory expressions which may be inferred from facts and circumstances that show an intent to be bound. (*Century 21 Castles By King, Ltd. v. First National Bank* (1988), 170 Ill. App. 3d 544, 548.) An implied-in-fact contract to pay for services is established if the party seeking payment shows that the services were carried out under circumstances which would give the recipient reasons to understand that they had not been performed gratuitously or for some other person. (*Knecht Services, Inc.*, 216 Ill. App. 3d at 851.) In *Knecht Services, Inc.* we concluded that implied-in-fact contracts existed when the consumers contacted defendants to request their services and it was clear from the evidence that the consumers intended to pay for those services. (216 Ill. App. 3d at 851.) Because the same is true in this case, we conclude there was an implied-in-fact contract between Carrie Ekl and defendant.

■■ We do not agree, however, with defendant's contention that payment of his regular charges was a term of that contract even though Carrie Ekl testified that she anticipated paying defendant's regular charges. If there is an express or implied contract pursuant to which one party agrees to provide services to another and there is no provision setting forth the amount that is to be paid, the law implies an agreement to pay a reasonable price for the services. (*Victory Memorial Hospital v. Rice* (1986), 143 Ill. App. 3d 621, 623; *Protestant Hospital Builders Club v. Goedde* (1981), 98 Ill. App. 3d 1028, 1031.) Regardless of what Carrie Ekl anticipated paying, there is no evidence of an express or implied promise to pay defendant's regular charges at the time the contract was formed.

Even if Carrie had expressly agreed to pay defendant's regular charges the result would not be different. In *Victory Memorial Hospital*, the defendant expressly agreed to pay the plaintiff's regular charges, and in *Protestant Hospital* the defendant expressly agreed to pay the price designated by plaintiff. (*Victory Memorial Hospital*, 143 Ill. App. 3d at 624; *Protestant Hospital*, 98 Ill. App. 3d at 1031.) The courts in both cases determined that these contractual terms were too indefinite to enforce and held that the implied-in-fact contracts obliged plaintiffs to pay a reasonable price for the services ren-

dered. (*Victory Memorial Hospital,* 143 Ill. App. 3d at 623-24; *Protestant Hospital,* 98 Ill. App. 3d at 1031.) We therefore conclude that the implied-in-fact contract between Carrie Ekl and defendant only obligated the Ekls to pay a reasonable price for defendant's services.

■ The court in *Protestant Hospital* also noted that if a party acquiesces to a statement of account rendered by another that party will be liable for the billed amount under the theory of an account stated. (*Protestant Hospital,* 98 Ill. App. 3d at 1032.) Defendant contends that Carrie assented to the terms of invoice by signing it and paying defendant the requested amount. The trial court, however, found Carrie's testimony that defendant threatened to undo the work and turn off the water if she did not pay immediately to be credible. An agreement will be voided if it results from duress. (*First Security Bank v. Bawoll* (1983), 120 Ill. App. 3d 787, 793.) Duress exists if a party is induced by the wrongful act of another to make a contract under circumstances which deprive the party of the exercise of her free will. (*Bawoll,* 120 Ill. App. 3d at 793.) This includes acts or threats which are wrongful in a moral sense. (*Kaplan v. Kaplan* (1962), 25 Ill. 2d 181, 186.) Any wrongful threat which actually places the victim in such fear as to cause her to enter into an agreement against her will constitutes duress. *Kaplan,* 25 Ill. 2d at 186.

There is no question that the threats defendant was found to have made were wrongful. Our prior analysis shows that at the time the threats were made the amount due defendant remained open to negotiation between the parties. Therefore defendant was not entitled to undo the work merely because Carrie Ekl refused to pay rates far in excess of what the trial court determined to be reasonable. By defendant's own admission, the rate at which he billed the Ekls was about 3½ times the rate generally charged by his main competitors. It is also obvious that defendant had no right to turn off the Ekls' water. The threatened actions if carried out would have constituted the offense of criminal damage to property (Ill. Rev. Stat. 1989, ch. 38, par. 21—1(a)). These threats were wrongful in both a legal and a moral sense.

According to Carrie Ekl's testimony, which the trial court determined to have been credible with regard to the alleged threats, she initially expressed outrage at the amount of the bill and stated that she wished to have her husband review it before paying. Defendant then made the aforementioned threats and Carrie paid the bill because she was afraid of him and wanted him out of the house. This testimony shows that Carrie agreed to pay the bill against her will and only because of a fear that defendant and his helper would carry

out the threats. Therefore any agreement by Carrie to pay the amount billed by defendant was void because it was the product of duress. There was no valid agreement between the parties that the Ekls would pay $480 for defendant's services; they were only obligated to pay a reasonable amount.

In determining whether a practice is unfair under the Act, courts are guided by the following factors: (1) whether the practice even if not unlawful offends public policy as established by statutes, the common law or otherwise, or, in other words, whether it is at least within the penumbra of some established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it results in substantial injury to consumers. (*Knecht Services, Inc.*, 216 Ill. App. 3d at 854; *People ex rel. Fahner v. Walsh* (1984), 122 Ill. App. 3d 481, 484.) Utilizing these standards, we find that defendant's practice of employing wrongful threats to collect his fees violated the Act.

Applying the first of these criteria, it is apparent that defendant's conduct is offensive to public policy. As we have seen, defendant threatened to commit the offense of criminal damage to property if Carrie did not pay the billed amount immediately. The common-law doctrine that contracts which are the product of duress will be voided is indicative of an established public policy against the use of threats to force others to enter into agreements. The threats that defendant was found to have made violated this established public policy.

The employment of such strong-arm tactics against a consumer who was acting within her rights when she questioned defendant's substantial charges is immoral, unethical, oppressive, and unscrupulous. (See *Knecht Services, Inc.*, 216 Ill. App. 3d at 856.) Finally, these actions caused substantial injury to the Ekls because Carrie was deprived of her bargaining power and forced to pay an unreasonable amount in excess of what she would have voluntarily paid. We therefore agree with the trial court's conclusion that defendant violated the Act. Although defendant disparages the trial court's alleged interference with the contractual process, it is the coercive conduct defendant was found to have engaged in which hampered that process. While, as defendant points out, the Act may not have been intended to protect consumers from the consequences of bad bargaining, we believe it was intended to protect consumers from unscrupulous merchants and tradespeople who deprive them of the ability to bargain through threats and coercion.

The circuit court did not rely upon defendant's threats to Carrie Ekl in its determination that defendant violated the Act. A reviewing

court may, however, sustain the circuit court's decision on the basis of any grounds which are apparent from the record. (*Bell v. Louisville & Nashville R.R. Co.* (1985), 106 Ill. 2d 135, 148.) On the basis of the trial court's factual findings, we therefore conclude that defendant violated the Act.

Defendant also contends that the $4,700 punitive damage award was excessive and that the trial court in making the award erroneously considered certain testimony that had been stricken. The purposes of punitive damages are to punish the wrongdoer and to deter that party and others from committing similar wrongful acts. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 204.) Relevant circumstances in reviewing a punitive damage award include, but are not limited to, the nature and magnitude of the wrong, defendant's financial status, and defendant's potential liability. (*Deal*, 127 Ill. 2d at 204.) Although courts should be cautious in awarding punitive damages due to their penal nature, an award of punitive damages will not be disturbed upon review on the basis that it is excessive unless it appears that the award resulted from passion, partiality, or corruption. 127 Ill. 2d at 203-04.

■ Defendant initially asserts that the nature of his wrongful actions is not such as to justify any award of punitive damages. Punitive damages may only be awarded for conduct that is outrageous either because the acts are done with an evil motive or because they are performed with a reckless indifference toward the rights of others. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 415-16.) Here, according to the findings of the trial court, defendant extorted money from Carrie Ekl by threatening to turn off the water in the Ekl home and rip out the sections of pipe he had replaced. Defendant's motive of collecting an unreasonable fee by threatening to damage the Ekl home was evil and reprehensible. An award of punitive damages was proper in this case.

According to defendant, the punitive damage award was excessive because his wrongful acts were not of a sufficient magnitude to justify such a substantial award and because plaintiffs failed to present evidence of defendant's financial status. Although the ratio between the punitive and compensatory damage awards was greater than 15 to 1, there is no requirement that a punitive damage award bear any particular proportion to the size of the compensatory damage award. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 204 (punitive damage award affirmed despite 19 to 1 ratio).) While defendant argues that charging high fees and failing to disclose those fees up front is not so outrageous as to justify a $4,700 punitive damage award, he ignores the

reprehensible nature of the strong-arm tactics he was found to have engaged in. As we have seen, defendant was only entitled pursuant to his implied-in-fact contract with Carrie Ekl to receive a reasonable sum for his services. By threatening to damage the Ekl home, he extorted a sum from her that was several times in excess of what his competitors charged. This type of conduct fully justifies the punitive damage award of $4,700.

The fact that no evidence was presented concerning defendant's financial circumstances does not change our view. In *Deal*, no evidence concerning the defendants' financial status was introduced and the court held that plaintiff was not required to present such evidence. (127 Ill. 2d at 203-04.) The court further stated that defendants could not complain of the absence of such evidence when they had made no attempt to present any. 127 Ill. 2d at 205.

Defendant contends that the rule recently set forth in *Black v. Iovino* (1991), 219 Ill. App. 3d 378, 395, that a plaintiff's failure to introduce evidence of a defendant's financial status limits recovery of punitive damages to an amount sufficient to punish or deter an individual without pecuniary resources should be applied here. We are uncertain of the validity of the rule when our supreme court, which affirmed a $25,000 punitive damage award in *Deal*, mentioned no such rule and stated that defendants could not complain of the absence of evidence of their financial status when they had presented none. Even if we apply the rule, however, the award was not excessive. A substantial punitive damage award was necessary to deter defendant from engaging in improper practices which were so lucrative and enabled him to collect $148 per hour. The punitive damage award was not excessive.

■ Defendant also argues that it was error for the trial court to consider in awarding punitive damages his own testimony that a 1989 price increase resulted largely from expenses relating to the lawsuit filed by the Attorney General. Defendant first contends that the testimony was irrelevant because the increase occurred a year after he worked on the Ekl job. We disagree. The testimony indicates that expenses from the present suit, including a punitive damage award, could also be passed on to consumers, a relevant factor in determining an amount sufficient to deter similar future conduct.

The above testimony was presented while defendant was testifying as an adverse witness in plaintiffs' case. Defendant also testified that his 1988 prices were higher than those of his competitors and this resulted from attorney fees and other expenses relating to the Attorney General's lawsuit. When plaintiffs' attorney completed his

questioning, defendant's attorney questioned him. After this took place, the trial court struck the testimony relating to the 1989 increase. When the trial judge announced the damage award, he stated that he had reconsidered this ruling and considered the previously stricken testimony in awarding punitive damages.

Defendant complains that the trial court's consideration of this testimony was an unfair surprise which denied him the chance to rebut the testimony. We disagree for several reasons. First of all, the testimony defendant feels he should have been able to refute was his own testimony. Secondly, defendant's attorney had an opportunity to rehabilitate defendant during the examination that occurred prior to the time the testimony was stricken. Defendant's attorney did, in fact, ask several questions at this time about the Attorney General's lawsuit and its effect upon defendant's business. Finally, defendant's testimony relating to his 1988 prices was never stricken. Defendant therefore still had the incentive to present evidence refuting his testimony concerning the effect of the Attorney General's lawsuit upon his prices had he been able to do so. Therefore defendant was not prejudiced by the trial court's action.

Plaintiffs cross-appeal and contend that the trial court abused its discretion by denying their request for attorney fees pursuant to section 10a(c) of the Act (Ill. Rev. Stat. 1989, ch. 121½, par. 270a(c)). Section 10a(c) provides that in an action brought pursuant to the Act, the trial court may award attorney fees to the prevailing party. (Ill. Rev. Stat. 1989, ch. 121½, par. 270a(c).) When the word "may" is used in a statute it generally implies permissive or discretionary rather than mandatory action. (*Tague v. Molitor Motor Co.* (1985), 139 Ill. App. 3d 313, 318.) Thus, the decision as to whether attorney fees should be awarded to the prevailing party in an action under the Act rests within the sound discretion of the trial court. *Kleidon v. Rizza Chevrolet, Inc.* (1988), 173 Ill. App. 3d 116, 123.

In *Tague*, a substantial award of punitive damages was imposed by the jury and affirmed on appeal. The court also affirmed the trial court's denial of fees under the Act, ruling that the denial of fees was not an abuse of discretion. (*Tague*, 139 Ill. App. 3d 313.) Likewise, there was a substantial punitive damage award in the case at bar. It would appear that the purposes of allowing attorney fee awards under the Act are to punish and deter violators of the Act and potential violators and to encourage consumers to bring lawsuits to vindicate their rights especially when small sums of money are involved. The trial judge could have reasonably concluded that the large punitive damage award was sufficient to serve the above purposes.

The denial of attorney fees to plaintiffs was not an abuse of discretion.

Plaintiffs further contend, however, that they were at least entitled to a hearing on their fee request. As plaintiffs point out, in *Beno v. McNew* (1989), 186 Ill. App. 3d 359, 366, this court held that the trial court erred by summarily disposing of defendant's motion for attorney fees pursuant to section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—611), without a hearing. The motion had been filed after the plaintiff voluntarily dismissed his complaint. This court acknowledged in *Beno* that no hearing is required in cases where the existence of grounds for section 2—611 relief can be established without one. (*Beno*, 186 Ill. App. 3d at 366.) One such case was *Dayan v. McDonald's Corp.* (1984), 126 Ill. App. 3d 11, 22-23, in which the trial court was able to determine whether section 2—611 relief was appropriate from the evidence produced at trial.

In the case at bar, like *Dayan* and unlike *Beno*, a trial was held. Because section 10a(c) of the Act (Ill. Rev. Stat. 1989, ch. 121½, par. 270a(c)) provides the trial court with discretionary authority to award attorney fees to the prevailing party, no hearing was necessary for the trial court to determine whether grounds for a fee award existed. *Beno* is therefore distinguishable and is not controlling in this case. The trial judge was aware that a statutory ground for an award of attorney fees existed, but he properly exercised his statutory discretion in denying such an award. No hearing was required under the circumstances of this case.

Finally, two motions have been filed which we have ordered taken with the case. Defendant has moved to strike those portions of plaintiffs' reply brief dealing with matters other than the issue raised in the cross-appeal. We grant this motion because a cross-appellant must confine his or her reply brief to issues raised in the cross-appeal (134 Ill. 2d R. 343(b)(i)). Plaintiffs have moved to strike any reference in defendant's briefs to the case of *Black v. Iovino* because the Appellate Court for the First District temporarily withdrew the opinion from publication. As this opinion has now been released for publication, plaintiffs' motion is denied.

For the above reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

NICKELS and GEIGER, JJ., concur.