In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3422

RANDY COHEN, both individually and
as a representative of all other persons
similarly situated,

*Plaintiff-Appellant,*

*v.*

AMERICAN SECURITY INSURANCE
COMPANY, and WACHOVIA MORTGAGE,
FSB f/k/a WORLD SAVINGS BANK, FSB,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CV 1363 — **Robert M. Dow, Jr.**, *Judge.*

ARGUED SEPTEMBER 13, 2012 — DECIDED NOVEMBER 4, 2013

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* Home-mortgage lenders often require
the borrower to maintain hazard insurance on the mortgaged

property to protect the lender's interest in the collateral. If the borrower fails to keep the property insured, the lender has the option to secure the insurance itself and pass the cost on to the borrower.

In this proposed class action, Martha Schilke alleges that Wachovia Mortgage, FSB, her lender and holder of a mortgage on her home, fraudulently placed insurance on her property when her homeowner's policy lapsed. Wachovia secured the replacement coverage from American Security Insurance Company ("ASI") and charged her for it, as specifically permitted under her loan agreement. The premium was more than twice what she had paid for her own policy and included a commission to Wachovia's insurance-agency affiliate, again as permitted under the loan agreement. Schilke calls the commission a "kickback."

On behalf of herself and a class, Schilke sued Wachovia and ASI asserting multiple statutory and common-law claims for relief, most sounding in fraud or contract.[1] The district court dismissed the complaint in its entirety—and also rejected two attempted amendments—based on federal preemption and the filed-rate doctrine.

We affirm but on different grounds. The complaint and the proffered amendments do not state any viable claim for relief. The loan agreement and related disclosures and notices

---

[1] Schilke assigned her claims to Randy Cohen after this appeal was filed. We have substituted him in the caption, but because all the allegations pertain to Schilke's transaction with Wachovia, we otherwise ignore his presence in the case.

conclusively demonstrate that there was no deception at work. It was Schilke's responsibility to maintain hazard insurance on the property at all times; if she failed to do so, Wachovia had the right to secure the insurance itself and pass the cost on to her. Wachovia fully disclosed that lender-placed insurance may be significantly more expensive than her own policy and may include a fee or other compensation to the bank and its insurance-agency affiliate. In short, maintaining property insurance was Schilke's contractual obligation and she failed to fulfill it; because the consequences of that failure were clearly disclosed to her, none of her claims for relief can succeed.

## I. Background

The following facts are from the complaint and its attachments and certain related notices and correspondence Wachovia submitted to the district court without objection from Schilke.[2] On or about March 22, 2006, Schilke purchased

---

[2] This case is before us on appeal from orders dismissing the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure and denying leave to amend. "[A] motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745–46 n.1 (7th Cir. 2012). Several documents relating to Schilke's loan agreement were attached to the complaint, and the defendants submitted several more with their motion to dismiss. Schilke moved to strike the defendants' motion and accompanying brief on the ground that they improperly incorporated material extrinsic to the complaint. The district court denied the motion to strike but allowed Schilke to object to the court's consider-

(continued...)

a townhouse and mortgaged it to her lender, World Savings Bank, FSB, which later merged with Wachovia. The loan agreement requires Schilke to maintain property insurance on her home:

### 5. BORROWER'S OBLIGATION TO MAIN-TAIN INSURANCE

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender.

---

[2] (...continued)
ation of the extrinsic material in her briefing on the motion. She did not do so. Accordingly, she waived any objection to the court's consideration of the additional documents. Moreover, the district court held that the additional documents submitted by the defendants were "referred to in different versions of [p]laintiff's complaints and are central to [p]laintiff's claims." There is no challenge to this ruling.

> The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.
>
>      … .
>
>      If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

The agreement also authorizes the lender to purchase insurance on the property if the borrower fails to do so:

> **7. LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**
>
>      If … I do not keep my promises and agreements made in this Security Instrument … , then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may, without limitation, include … purchasing insurance required under Paragraph 5 above (such insurance may cost more and provide less coverage than the insurance I might purchase) … . Lender must give me notice before Lender may take any of these actions. …

> I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest … . I will pay those amounts to Lender when Lender sends me a notice requesting that I do so.

At the closing Schilke also signed a Notice of Fire/Hazard Insurance Requirements, which states as follows:

> The terms of our loan documents require maintenance of continuous insurance coverage. If at any time during the life of the loan, a policy is cancelled or replaced or an insurance agent is substituted, we must receive written evidence of the insurance and written evidence of the substitution of the insurance agent. Written evidence of insurance is defined as: **A COPY OF THE REINSTATEMENT NOTICE FOR THE CANCELLED POLICY OR A COPY OF THE REPLACEMENT POLICY—BINDERS ARE ACCEPTABLE IN THE STATES NOTED IN ITEM 7 ABOVE.**
>
> **NOTE:** If we do not receive such evidence prior to the termination date of the previous coverage, we may at our sole option, obtain an insurance policy for our benefit only, which would not protect your interest in the property or the contents. We would charge the premium due under such a policy to your loan and the loan payment would increase accordingly.

> We may assess a processing fee and our affiliated insurance agent could collect a commission from the insurer. The cost for such insurance could be at least two to five times greater and provide you with less protection than insurance you could purchase directly from an insurer.

As relevant here, Schilke purchased insurance for her home in January 2008. On May 9, 2008, Wachovia sent a letter to Schilke noting that her policy had lapsed on April 8 and requesting proof of insurance coverage within 14 days. She did not respond.

On June 12, 2008, Wachovia sent another letter to Schilke again requesting proof of insurance and notifying her that it had acquired temporary insurance coverage—a "binder"—from ASI. Enclosed with this letter was a form entitled "Illinois Notice of Placement of Insurance" in which Wachovia described the binder and advised Schilke that she was responsible for the cost. This notice explained that the annual premium for the binder was $2,034 and that the insurance was backdated to April 8, the day her own insurance lapsed. Wachovia advised Schilke that if she provided proof of insurance, it would cancel the binder and refund any premiums paid by her. Finally, Wachovia warned Schilke that if she did not provide proof of insurance coverage within 30 days, it would replace the binder with a 12-month insurance policy and charge Schilke for the premium, which would likely be more expensive than her own coverage:

> The premiums charged for this coverage are usually higher than the same coverage

purchased directly by the customer. The higher
rate for lender-placed insurance reflects limited
insurance coverage and underwriting risk associ-
ated with this policy. The premium may include
compensation to the insurer and Wachovia
Mortgage for tracking customers' compliance
with Wachovia Mortgage insurance require-
ments. The premium for such a policy will be
$2,034.00 for a twelve-month policy. Your
monthly mortgage payment will be adjusted to
collect for the cost of the new coverage. You may
avoid these costs by obtaining your own insur-
ance, as required by Wachovia Mortgage, in a
timely manner. Upon receipt of proof of accept-
able coverage, this policy will be canceled. You
will be charged only for the days that this policy
was needed. Any unearned premium will be
refunded on a pro-rata basis.

Schilke did not respond to this letter. On July 18, 2008,
Wachovia again wrote to Schilke, this time informing her that
it had secured a 12-month insurance policy on the mortgaged
property through ASI at a cost of $2,034. Wachovia reiterated
Schilke's option to secure her own insurance, stating that if she
provided proof of insurance, the ASI premium would be
refunded on a pro rata basis.

Schilke did not secure her own insurance. Instead, a year
later she filed this class-action suit against Wachovia and ASI
alleging, in substance, that their conduct was deceptive
because they did not disclose that Wachovia was receiving

"kickbacks" from ASI. The complaint asserted a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act and claims for common-law fraud, conversion, and unjust enrichment.

Wachovia and ASI moved to dismiss under Rule 12(b)(6) for failure to state a claim, advancing a number of alternative grounds for dismissal. The district court granted the motion, holding that the statutory and common-law claims against Wachovia were preempted by regulations issued by the bank's federal regulator, the Office of Thrift Supervision. The court also held that the claims against ASI were barred by the filed-rate doctrine, which precludes challenges to rates charged by public utilities and other regulated entities when their rates are required to be filed with and approved by a governmental agency. To the extent that the claim for injunctive relief against ASI survived the filed-rate doctrine, the court held that the complaint did not plausibly allege that the insurer proximately caused Schilke's injury.

Schilke moved to vacate the judgment and also sought leave to file an amended complaint. She proposed adding claims for breach of contract against both defendants and "clarified" that her claim under the Consumer Fraud Act was based on allegations that the challenged conduct was not only "deceptive" but also "unfair" within the meaning of the Act. The district court rejected the proposed amendment, concluding that federal preemption and the filed-rate doctrine precluded the new breach-of-contract claims and that Schilke's "clarification" did not change the analysis. But the court gave Schilke one more chance to offer an amended complaint.

Schilke accordingly submitted a proposed third amended complaint. This version departed more substantially from the earlier iterations. Schilke now proposed to join Assurant, Inc., ASI's parent, as a defendant. She also rearranged the claims so that one set sought injunctive relief, one set sought damages for the alleged "kickbacks," and one set sought damages arising from the backdating of the lender-placed coverage. Finally, Schilke proposed to add new derivative claims for conspiracy, aiding and abetting, acting "in concert," and "intentional interference." None of these modifications materially changed the core allegations of the complaint. The judge denied leave to amend the complaint on grounds of futility and entered final judgment.[3] This appeal followed.

## II. Discussion

The district court dismissed the complaint and twice denied leave to amend on grounds of futility. Schilke appears to challenge all of these rulings, although her briefs are not

---

[3] The district court also denied Schilke's request for sanctions against ASI's counsel under Rule 11 of the Federal Rules of Civil Procedure. In opposing Schilke's proposed third amended complaint, ASI had submitted affidavits explaining its relationship with Assurant. In her reply brief, Schilke contended that the affidavits contained false statements and asked for Rule 11 sanctions. After rejecting Schilke's proposed third amended complaint, the district court denied her Rule 11 request as moot. On appeal Schilke argues that the rejection of her third amended complaint did not moot her request for sanctions. Perhaps the Rule 11 request wasn't moot, but it was procedurally improper: It was not made by separate motion, as required by the rule. *See* FED. R. CIV. P. 11(c)(2). The district court was entitled to disregard the sanctions request.

entirely clear about which claims remain at issue. She asserted several dozen claims across three complaints; many are duplicates or derivative of other claims. For ease of analysis and to avoid repetition, we review the claims in the original complaint and the proposed amendments together, combining closely related and derivative claims and eliminating duplicates. Our review is de novo. *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) (applying de novo review to district court order dismissing the plaintiff's complaint under Rule 12(b)(6) and denying leave to amend on grounds of futility); *see also Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) ("There is no practical difference, in terms of review, between a denial of a motion to amend based on futility and the grant of a motion to dismiss for failure to state a claim.").

The district court dismissed all of the claims against Wachovia on preemption grounds and rejected most of the claims against ASI under the filed-rate doctrine. The preemption question is intricate; it involves a broad preemption regulation promulgated by the Office of Thrift Supervision pursuant to authority granted by the Home Owners' Loan Act, 12 U.S.C. §§ 1461 *et seq.*, but also a savings clause that preserves contract, commercial, and tort claims, *see* 12 C.F.R. § 560.2(c); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 576–80 (7th Cir. 2012); *In re Ocwen Loan Servicing, LLC Mortg. Servicing*, 491 F.3d 638, 642 (7th Cir. 2007). As for the filed-rate doctrine, we question whether it applies. The doctrine protects public utilities and other regulated entities from civil actions attacking their rates if the rates must be filed with the governing regulatory agency and the agency has the authority to set, approve, or disapprove them. *See Arsberry v. Illinois*, 244 F.3d 558, 562

(7th Cir. 2001); *Horwitz v. Bankers Life & Cas. Co.*, 745 N.E.2d 591, 596 (Ill. App. Ct. 2001). Although ASI is required to file its insurance rates with the Illinois Department of Insurance, it is not at all clear that the Department has the authority to approve or disapprove property-insurance rates. *See* Nathaniel S. Shapo, *Regulation of Rates and Risk Classification*, *in* 2 NEW APPLEMAN ON INSURANCE § 11.02[4][3], 11–25 (Jeffrey Thomas ed., Law Library ed. 2012) (identifying Illinois as the only state in the country in which insurance regulators lack the express authority to regulate property-insurance rates). At oral argument ASI conceded that the Department's authority to set property-insurance rates is at best implicit.

We can avoid the nuanced questions of federal preemption and the filed-rate doctrine here. The district court properly dismissed the complaint and rejected Schilke's proposed amendments for a different and more fundamental reason: Schilke failed to state any viable claim for relief. The defendants preserved this argument below and raised it in this court as an alternative basis on which to affirm the judgment. *Burns v. Orthotek, Inc. Emp'rs Pension Plan & Trust*, 657 F.3d 571, 575 (7th Cir. 2011) (holding that reviewing court may affirm on any ground that the record fairly supports and has not been waived). So we proceed directly to the question of the sufficiency of the complaint, accepting its factual allegations as true, drawing reasonable inferences in Schilke's favor, and assessing whether it plausibly states any claim for relief. *Brooks v. Pactiv*, 729 F.3d 758, 763 (7th Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### 1. *Illinois Consumer Fraud Act*

The complaint alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1 *et seq*. "The Consumer Fraud Act is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). Prohibited "unfair" and "deceptive" practices include, but are not limited to, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of any trade or commerce … ." 815 ILL. COMP. STAT. 505/2. A person who suffers actual damage as a result of a violation of the Act has a civil remedy against the violator. *See id.* 505/10a(a). The Illinois Supreme Court has explained that "[t]he elements of a claim under the Act are: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during a course of conduct involving trade or commerce." *Robinson*, 775 N.E.2d at 960.

Our first question is whether Schilke has plausibly alleged an "unfair" or "deceptive" act or practice within the meaning of the Act. The answer is "no." The loan agreement and Wachovia's disclosures, notices, and correspondence conclusively defeat any claim of fraud, false promise, concealment, or misrepresentation. First, the notice that Schilke signed in

conjunction with her home-loan transaction clearly described
the consequences of her failure to maintain hazard insurance
on the property as required under the loan agreement:

> If we do not receive [proof of insurance] prior to
> the termination date of the previous coverage,
> we may at our sole option, obtain an insurance
> policy for our benefit only, which would not
> protect your interest in the property or the
> contents. We would charge the premium due
> under such a policy to your loan and the loan
> payment would increase accordingly.

> We may assess a processing fee and our affiliated
> insurance agent could collect a commission from
> the insurer. The cost for such insurance could be
> at least two to five times greater and provide you
> with less protection than insurance you could
> purchase directly from an insurer.

Thus, from the very beginning, Wachovia warned Schilke
that she may pay a substantially higher premium—even five
times what she had been paying—if lender-placed insurance
became necessary.

Wachovia's subsequent communications with Schilke did
not depart from the initial warnings. The bank's May 9, 2008
letter disclosed the exact cost of the insurance that it would
secure in light of the lapse in Schilke's homeowner's insurance
and reiterated that the premium may include compensation to
Wachovia and its insurance-agency affiliate. The June and July
letters contained the same disclosures.

Schilke's complaint characterizes the fee and commission to Wachovia and its insurance affiliate as "kickbacks." She seems to think that merely applying this label converts the bank's otherwise clear disclosures into a prohibited deceptive act. Not so. The substance of the transaction was clearly and fully disclosed; no material fact was omitted.

Schilke argues that even if there was no deception, her allegations are sufficient to state a claim for "unfair" business practices under the Act. To the extent that "unfair practices" comprise a broader class of prohibited conduct under the Act, Schilke's allegations still fall short of stating a claim for relief. The Act provides that in "construing this section[,] consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 ILL. COMP. STAT. 505/2. The Federal Trade Commission, the United States Supreme Court, and the Illinois Supreme Court consider the following factors as relevant to the inquiry: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972); *Robinson*, 775 N.E.2d at 960–61 (adopting and applying factors in Illinois).

Assessing the complaint against these factors, the closest Schilke comes to stating a claim is a conclusory allegation of coercion: She contends that she and the class members were "coerced into having insurance provided by ASI at a price far above that which they had previously paid." It's not clear

when this alleged coercion might have taken place. There cannot have been any coercion when Wachovia presented Schilke with the choice of maintaining her own insurance or having Wachovia insure the property and pass the cost along to her. Putting a counterparty to the choice specified in the parties' contract—in other words, insisting that a contract partner fulfill his contractual duties or face the agreed-upon consequences—is not coercion. The argument here is stranger still: Schilke contends that Wachovia placed her on the hook for more expensive insurance by giving her the option of buying her own, *less*-expensive insurance—insurance she had a duty to maintain under the terms of the mortgage-loan agreement.

Indeed, the choice to purchase her own, less-expensive insurance was available to Schilke at all times, even *after* Wachovia purchased the lender-placed insurance. When the bank put the binder in place, and then again when it secured the 12-month policy, it sent letters reminding Schilke that she need only present proof of insurance and the lender-placed insurance coverage would be cancelled and the premium refunded on a pro rata basis.

Schilke points out that her failure to pay the premium for the lender-placed policy risked a declaration of default on her loan and the institution of foreclosure proceedings. But if it was not coercive to demand that Schilke maintain insurance coverage on the property (and it certainly was not), it cannot have been coercive for Wachovia to threaten to invoke the contractual remedies available for breach of that duty. Again, there is nothing oppressive or unscrupulous about giving a

counterparty the choice to fulfill his contractual duties or be declared in default for failing to do so.

The Illinois Supreme Court's decision in *Robinson* is analogous here. In that case lessees of automobiles sued the lessor alleging that the lease agreements violated the Consumer Fraud Act by imposing penalties for "excess wear and tear" to the leased vehicles and also for "excess mileage" on those vehicles. *Robinson*, 775 N.E.2d at 961–62. The plaintiffs alleged that the penalties were duplicative and therefore unfair in violation of the Act. The Illinois Supreme Court rejected the claim, agreeing with the lower court that "there was a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness [because] plaintiffs could have gone elsewhere to lease a car." *Id.* at 962.

Here, as in *Robinson*, Schilke never lacked a meaningful choice to avoid expensive lender-placed property insurance. Wachovia reminded her at every step that she could comply with her obligation to purchase insurance or have the coverage placed by Wachovia at a much higher cost. To use the Illinois Supreme Court's formulation, there was a "total absence of oppressiveness" because all along she "could have gone elsewhere" to buy cheaper insurance. *Id.*

To illustrate its point, the *Robinson* court compared the auto lessees' circumstances to those confronting the plaintiff in *Ekl v. Knecht*, 585 N.E.2d 156, 162 (Ill. App. Ct. 1991), in which a plumber extracted an unreasonable fee from a customer by threatening to undo all of the repairs he had just made. The Illinois Appellate Court held in *Ekl* that the plumber's threats

were coercive, oppressive, and caused substantial harm to the customer because the plumber

> was not entitled to undo the work merely because [the customer] refused to pay rates far in excess of what the trial court determined to be reasonable. … The threatened actions if carried out would have constituted the offense of criminal damage to property … . These threats were wrongful in both a legal and a moral sense.

*Id.* at 162–63.

There are no allegations here of threats to take illegal, immoral, or otherwise wrongful action against Schilke. To the contrary, Wachovia simply reminded her of its contractual and legal remedies if she remained in breach of her obligation to maintain insurance on the mortgaged property.

Schilke insists that her allegations are sufficient to state a claim under the Act because the commission paid to Wachovia's insurance-agency affiliate was a kickback and kickbacks are against public policy, *period*. We do not doubt that kickbacks violate public policy. As one Illinois court has explained:

> Illinois has a clear policy against kickbacks regardless of who the players in that kickback scheme might be. *See* 225 ILCS 85/23 (West 2002) (making it unlawful for a pharmacist or pharmacy to offer a kickback to hospitals, doctors, and anyone else authorized to prescribe drugs for steering business to that pharmacist or

pharmacy); 305 ILCS 5/8A–3 (West 2002) (criminalizing any kickback in connection with determining one's eligibility for public aid); 305 ILCS 5/8A–16(5) (West 2002) (stating that "[o]ffering any kickback, bribe, reward, or benefit to any person as an inducement to select or to refrain from selecting any health care service, health plan, or health care provider" is a Class A misdemeanor); 720 ILCS 5/33E–7 (West 2002) (making it a Class 3 felony to offer or solicit a kickback during negotiations for public contracts); 805 ILCS 5/8.70 (West 2002) (imposing treble damages and attorney fees upon any officer or director of a corporation found to be involved in any kickback or bribery scheme) … .

*Johnson v. Matrix Fin. Servs. Corp.*, 820 N.E.2d 1094, 1100 (Ill. App. Ct. 2004).

But simply calling the commission a kickback doesn't make it one. The examples listed in the foregoing passage from *Johnson* all describe the traditional understanding of a kickback: an agent, charged with acting for the benefit of a principal, accepts something of value from a third party in return for steering the principal's business to the third party. The defining characteristic of a kickback is divided loyalties. But Wachovia was not acting on behalf of Schilke or representing her interests. The loan agreement makes it clear that the insurance requirement is for *the lender's* protection: "All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** *to*

*protect Lender*. The form of all policies and renewals *must be acceptable to Lender. Lender will have the right to hold the policies* and renewals." (Emphases added.) The agreement also gives the lender broad discretion to act to protect its own interest in the property: "Lender may do and pay for whatever it deems reasonable or appropriate *to protect the Lender's rights* in the Property." (Emphasis added.) Wachovia's correspondence with Schilke reiterated the point: "Failure to provide [proof of insurance] may result in a policy being purchased by us at your expense to protect our interest." And Wachovia conspicuously reminded Schilke that lender-placed insurance could be much more expensive than her own insurance coverage.[4] Wachovia was not subject to divided loyalties; rather, it was subject to an undivided loyalty to itself, and it made this clear from the start.

---

[4] Wachovia's disclosures comport with the Illinois Collateral Protection Act, which states that "[t]his Act does not impose a fiduciary relationship between the creditor and the debtor. Placement of collateral protection insurance is for the sole purpose of protecting the interest of the creditor when the debtor fails to insure collateral as required by the credit agreement." 815 ILL. COMP. STAT. 180/45. The parties debate whether the Illinois Collateral Protection Act is preempted by the Office of Thrift Supervision ("OTS") Preemption Regulation. As we have explained, because the complaint fails to state a claim, we do not answer the preemption question here. We note, however, that section 180/45 appears to provide lenders with a beneficial safe harbor, while the OTS Preemption Regulation appears to preempt state laws that impose regulations or restrictions on lenders. Regardless, we mention the Illinois Collateral Protection Act not for its own legal force but as evidence that Illinois public policy does not regard lenders as being subject to divided loyalties when they act to insure their collateral.

The commission for the lender-placed insurance was not a kickback in any meaningful sense.

Accordingly, Schilke failed to state a claim for violation of the Consumer Fraud Act. The claims for conspiracy, aiding and abetting, and acting "in concert" to violate the Act are derivative and thus necessarily also fail.

### 2. *Breach of Contract*

The complaint alleges that Wachovia is liable for breach of contract because "there is no provision in the mortgage agreement allowing Wachovia to receive kickbacks." Again, the use of the pejorative term "kickback" is not meaningful here. Nothing in the loan agreement and related documents prohibits Wachovia and its insurance-agency affiliate from receiving a fee or commission when lender-placed insurance becomes necessary. To the contrary, the loan agreement and related notices and disclosures specifically contemplate this, and warned Schilke accordingly.

To the extent that Schilke's breach-of-contract claim rests on the duty of good faith that is implicit in every contract, it still misses the mark. The implied duty of good faith has been helpfully described as follows:

> Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper. That philosophy may animate the law of fiduciary obligations but parties to a contract are not each other's fiduciaries … .

Contract law imposes a duty, not to "be reason-able," but to avoid taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous. Suppose A hires B to paint his portrait to his satisfaction, and B paints it and A in fact is satisfied but says he is not in the hope of chivvying down the agreed-upon price because the portrait may be unsaleable to anyone else. This … would be bad faith, not because any provision of the contract was unreasonable and had to be reformed but *because a provision had been invoked dishonestly to achieve a purpose contrary to that for which the contract had been made*.

*Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992) (emphasis added) (citations omitted) (applying Illinois law).

Schilke's complaint might be loosely read to allege this kind of bad faith, but it does not do so *plausibly*, as *Iqbal* and *Twombly* require. *Iqbal*, 556 U.S. at 680; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Under the plausibility standard explained in *Iqbal* and *Twombly*, it's not enough to "plead[] facts that are 'merely consistent with' a defendant's liability.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)). The complaint must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* When the allega-tions are "not only compatible with, but indeed [are] more

likely explained by, lawful" conduct, the complaint fails to state a plausible claim for relief. *Id*. at 680.

Wachovia's various notices and disclosures clearly warned Schilke that lender-placed insurance could cost up to five times more than a borrower's self-purchased policy. The bank continuously reminded her that she could avoid this expensive alternative by restoring her own insurance coverage for the property—even retroactively—and receive a pro rata refund of the lender-placed insurance premium. On these facts any claim that Wachovia dealt with Schilke in bad faith is not plausible.

Schilke's contract claim is also premised on Wachovia's practice of backdating the lender-placed insurance to the date the borrower's policy lapsed. Again, nothing in the loan agreement prohibits this. Indeed, the loan agreement and related documents required Schilke to maintain *continuous* insurance coverage on her home, and reserved to the lender the right to do "whatever it deems reasonable or appropriate to protect the [l]ender's rights in the [p]roperty," including purchasing insurance if the borrower's own coverage lapses. This broad language includes the purchase of backdated insurance, which is necessary to maintain continuous hazard coverage on the property.

Schilke alleges that the defendants backdated the replacement coverage when they "knew full well" that "no loss … could have been claimed on the insurance policies." This allegation is conclusory and unaccompanied by any factual content to make it plausible. How could Wachovia or ASI know—either in Schilke's case or in the case of *any* particular

borrower—whether or not a property loss had occurred during the lapse period? Schilke doesn't say.

Finally, the complaint alleges a related claim against ASI for intentional interference with contract. A claim for intentional interference with contract requires that the defendant intentionally and unjustly induced another to breach a contract with the plaintiff. *See Grund v. Donegan*, 700 N.E.2d 157, 160 (Ill. App. Ct. 1998). Because Schilke has not alleged a viable breach-of-contract claim against Wachovia, her claim for intentional interference with contract against ASI necessarily fails.

### 3. *Fraud*

Schilke's fraud claim alleges that Wachovia "had a duty to disclose that the 'insurance premiums' charged to [p]laintiff and the [c]lass contained substantial kickbacks, but failed to do so." Once again, Schilke's premise that the commission was a kickback is faulty; for the sake of argument, we will set that point aside and take the claim at face value. In Illinois, as elsewhere, the elements of a common-law fraud claim are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996); *see also Wigod*, 673 F.3d at 569.

The complaint does not allege that Wachovia made a false statement of material fact; instead, the fraud claim rests on an

alleged omission of material fact. In Illinois omissions are actionable as fraudulent concealment, but only in limited circumstances. *See Wigod*, 673 F.3d at 571–72. In place of the false-representation element of the claim, fraudulent concealment requires

> that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff. A duty to disclose a material fact may arise out of several situations. First, if plaintiff and defendant are in a fiduciary or confidential relationship, then defendant is under a duty to disclose all material facts. Second, a duty to disclose material facts may arise out of a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff. This position of superiority may arise by reason of friendship, agency, or experience.

*Connick*, 675 N.E.2d at 593 (citations omitted).

The complaint alleges no facts or circumstances to support a finding of a duty to disclose. There are no allegations of any kind of special relationship between the parties. Neither Wachovia nor ASI was a fiduciary or agent for Schilke, nor did they have a relationship of trust with her. The parties operated at arm's length.

Nor has Schilke adequately pleaded causation or damages. She weaves several theories of causation and damage throughout the different iterations of the complaint, but are all variations on the same theme. The following are representative:

- "Plaintiff and the [c]lass … relied on the misrepresentations in good faith and to [her] detriment and [has] been prejudiced by making payments to [d]efendants which consisted of hidden kickbacks."

- "Plaintiff and the [c]lass were never informed by [d]efendants that less than full payment was acceptable without incurring above-mentioned consequences [declaration of default and institution of foreclosure proceedings] and hence the [p]aintiff and the [c]ass believed that if the total amount was not tendered to [d]efendants, the above adverse consequences would result."

- Because of the alleged omission, "[p]laintiff h[ad] no way to negotiate the terms of any 'insurance premiums.' "

The common premise underlying these allegations is that if Schilke had known of the supposed kickbacks, she would not have paid the premiums for the lender-placed insurance. But Wachovia was authorized by the loan agreement to impose these charges and Schilke was obligated to pay them. Her theory of damages seems to be that had she known the charges were really kickbacks, she would have breached her contractual duty to pay. That is senseless. Losing an opportunity to breach a contract cannot constitute a cognizable fraud harm.

### 4. *Conversion*

The complaint alleges that the defendants are liable for conversion because they collected insurance premiums that included kickbacks. In Illinois

> a proper complaint for conversion must allege: (1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendant over plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property.

*Gen. Motors Corp. v. Douglass*, 565 N.E.2d 93, 97 (Ill. App. Ct. 1990). The Illinois Supreme Court has further explained that

> the subject of conversion is required to be an identifiable object of property of which the plaintiff was wrongfully deprived. Money may be the subject of conversion, but it must be capable of being described as a specific chattel, although it is not necessary for purposes of identification that money should be specifically earmarked. However, an action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money.

*In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985). A cause of action for conversion does not lie where the plaintiff "voluntarily, albeit mistakenly, transferred money." *Douglass*, 565 N.E.2d at 100.

There are many problems with Schilke's conversion claim. First, to the extent that her theory of conversion rests on allegations of deception, it fails for the reasons we have already explained. There was no hiding the fact that lender-placed insurance would be more expensive than owner-purchased insurance and that the premiums could include a commission or fee to the lender. In addition, Schilke has not alleged a right to the property, let alone a "right to the immediate possession of the property, absolutely and unconditionally." *Id.* at 97. Nor has she alleged that she is seeking the return of the kind of readily identifiable chattel that is the proper subject of a conversion action. Rather, she simply seeks payment of an alleged debt. *See id.* at 97–101 (no action for conversion lies where the plaintiff seeks return of excess money mistakenly remitted to defendant by check). Finally, she has not alleged that she paid the premium involuntarily or that she made a demand for possession of payments made.

### 5. *Unjust Enrichment*

Finally, the complaint alleges that Wachovia unjustly enriched itself by retaining the commission—again, recast as a kickback—for the lender-placed insurance. We reiterate one more time that the "kickback" premise doesn't hold up, but even if we were to accept it, an unjust-enrichment claim is not viable here.

In Illinois recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and defendant. *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 2005); *Nesby v. Country Mut.*

*Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. Ct. 2004) ("Where there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application."). There are two related reasons for this rule. First, "[t]he theory of unjust enrichment is an equitable remedy based upon a contract implied in law." *Nesby*, 805 N.E.2d at 243. If an express contract exists to govern the parties' conduct, then there is no room for an implied contract. Second, "[b]ecause it is an equitable remedy, unjust enrichment is only available when there is no adequate remedy at law." *Id.* The first reason may be regarded as a specific application of the second reason—no implied contract can exist where an express one governs because no equitable remedy can lie where a legal one is available.

Of course, "a party may plead claims in the alternative, *i.e.*, she may plead a claim for breach of contract as well as unjust enrichment." *Guinn*, 836 N.E.2d at 704. But the inconsistent-pleading option in this context is limited. A plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is *not* an express contract, then the defendant is liable for unjustly enriching himself at my expense. That's not what Schilke is alleging here. She acknowledges throughout that there is an express contract. She claims that Wachovia is liable for breaching this express contract but that if it did not breach the contract, then it owes damages for unjust enriching itself. This manner of pleading unjust enrichment is impermissible: " '[W]hile [a] plaintiff may plead breach of contract in one count and unjust enrichment and promissory estoppel in others, it may not include allegations of an express contract which governs the relationship of

the parties, in the counts for unjust enrichment and promissory estoppel.' " *Id.* (quoting *The Sharrow Grp. v. Zausa Dev. Corp.*, No. 04 C 6379, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 6, 2004)).

Because an unjust-enrichment claim against Wachovia is unavailable, the derivative claims against ASI for conspiracy, acting "in concert," and aiding and abetting Wachovia's unjust enrichment are also unavailable. To the extent that the complaint asserts a direct unjust-enrichment claim against ASI, it founders on Schilke's faulty theory of deception, which is no stronger in this context than it is in any of her other claims for relief. If anything, the theory is doubly deficient as a claim against ASI because the insurer did not communicate with Schilke until *after* Wachovia purchased the insurance.

AFFIRMED.